AMERICAN FUTURE SYSTEMS, INC.,
et al., Plaintiffs,

v.

The PENNSYLVANIA STATE UNIVER-
SITY, et al., Defendants.

Civ. No. 81-0171.

United States District Court,
M.D. Pennsylvania.

Dec. 21, 1982.
As Amended Jan. 10 and Feb. 15, 1983.

See also, D.C., 510 F.Supp. 983.

James T. Moughan, Henry T. Reath, George E. Pierce, Jr., Duane, Morris & Heckscher, Philadelphia, Pa., for plaintiffs.

Delbert J. McQuaide, R. Mark Faulkner, McQuaide, Blasko, Schwartz, Fleming & Faulkner, State College, Pa., for defendants.

## OPINION

MUIR, District Judge.

### I. Introduction.

Plaintiffs, American Future Systems, Inc., Steven Brubaker, Richard J. Wingert, W. Bruce Del Valle, Joan D. Varsics, Dennis C. Habecker, John B. Spillar and Kevin Graves, filed this action alleging violations of their constitutional rights and of rights granted by Pennsylvania law on February 5, 1981. Also on February 5, 1981, Plaintiffs filed a motion for a preliminary injunction which was denied by this Court in *American Future Systems v. Pennsylvania State University,* 510 F.Supp. 983 (M.D.Pa. 1981). On July 17, 1981, Defendants, Pennsylvania State University, the Board of Trustees of the Pennsylvania State University, John W. Oswald and M. Lee Upcraft, filed a motion for summary judgment. By opinion and order of September 16, 1981, this Court granted the Defendants' motion for summary judgment. *American Future Systems v. Pennsylvania State University,* 522 F.Supp. 544 (M.D.Pa.1981). On August 9, 1982, the Court of Appeals reversed this Court's grant of summary judgment, *American Future Systems v. Pennsylvania State University,* 688 F.2d 907 (3d Cir.1982), and remanded the case to this Court for further proceedings. On September 21, 1982, the Court of Appeals issued an opinion Sur Petition for Rehearing. *American Future Systems v. Pennsylvania State University,* 688 F.2d 907, 916 (3d Cir.1982).

On October 18, 1982, Plaintiffs filed a motion for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and a supporting brief. By order of October 21, 1982, this matter was placed on the Court's December 1982 list for trial and by order of November 10, 1982, the Court scheduled the hearing in this case to commence on a day certain, Thursday, December 2, 1982, a most unusual event because of this Court's normal adherence to trailing dockets.

On November 29, 1982, at the pre-trial conference, Plaintiffs filed a concurred in request to amend the complaint and consistent therewith to amend the motion for a preliminary injunction. By order of December 2, 1982, the foregoing motions were granted.

The hearing on the Plaintiffs' motion for a preliminary injunction commenced at 11:00 A.M. on Thursday, December 2, 1982 and concluded at approximately 7:15 P.M. on Saturday, December 4, 1982. On December 9, 1982, Plaintiffs petitioned the Court for leave to present additional relevant information to the Court and for leave to file supplemental findings of fact. The petitions were opposed on December 17, 1982. The motion for leave to present additional relevant information relates to certain events which occurred subsequent to the close of the trial. First, the proposed additional relevant information relates to AFS's activities. Since AFS does not request injunctive relief in its own behalf, such evidence is not relevant to the present matter. Second, the additional information, since it is not subject to cross examination, may not properly be considered to be "evidence" in this proceeding. The motion to present additional relevant information will be denied. The Plaintiffs' request for leave to file supplemental findings of fact will be granted although the supplemental proposed findings should have been presented in handwritten form by the close of the hearing. Also on December 9, 1982, the Plaintiffs presented a form of proposed injunction

order which grants no relief to the corporate Plaintiff, A.F.S..

Following are the Court's findings of fact, discussion, conclusions of law, and order.

## II. Findings of Fact.

1. The original Plaintiffs were American Future Systems, Inc. ("AFS") Steven Brubaker, Richard J. Wingert, W. Bruce Del Valle, Joan D. Varsics, Dennis C. Habecker, John B. Spillar and Kevin Graves. (U)

2. Plaintiff AFS is a corporation incorporated under laws of the Commonwealth of Pennsylvania and having its principal place of business at 715 Lancaster Avenue, Bryn Mawr, Pennsylvania, 19019. (U)

3. Edward M. Satell is the President of AFS. (U)

4. AFS is a private enterprise engaged in the business of retail sales of table china, tableware, crystal, and cookware through the presentation of group demonstrations of its merchandise to students at colleges and universities throughout the United States.

5. Plaintiff Kevin Graves is a student enrolled at the Pennsylvania State University ("Penn State" or "University") who resides at 12 Jordan Hall which is a dormitory room in a University residence hall.

6. Richard J. Wingert is not a student at Penn State.

7. Joan D. Varsics is not a student at Penn State.

8. Dennis C. Habecker is not a student at Penn State.

9. John B. Spillar is not a student at Penn State and is no longer a Plaintiff in this litigation.

10. W. Bruce Del Valle is not a student at Penn State.

11. Defendants are Penn State, the Board of Trustees of Penn State ("Board of Trustees"), John W. Oswald and M. Lee Upcraft. (U)

12. Defendant Penn State is an institution of higher education established in 1855 by Act of the Pennsylvania Legislature as a corporation for educational purposes and operates under a charter consisting of various legislative acts supplemented by decrees of the Court of Common Pleas of Centre County, Pennsylvania.

13. The main campus of Penn State is located at University Park, Centre County, Pennsylvania, and the University maintains 21 other campuses situated in locations throughout the Commonwealth of Pennsylvania. (U)

14. Defendant Board of Trustees is the corporate body established by the charter of Penn State with ultimate control and responsibility for the management and government of the University. (U)

15. The Board of Trustees consists of 32 members, ten of whom are public officials of the Commonwealth of Pennsylvania. (U)

16. Defendant John W. Oswald is an individual residing at 639 Kennard Road, State College, Pennsylvania. (U)

17. Oswald is President and Chief Administrative Officer of Defendant University and has final authority, subject to revisions and orders by Defendant, Board of Trustees, to establish and implement policy concerning student affairs. (U)

18. Defendant M. Lee Upcraft is an individual residing at 188 Le Nor Drive, State College, Pennsylvania. (U)

19. Upcraft is Director of Residential Life Programs of Defendant University and is responsible for development, effectuation, and enforcement of policy concerning the residence halls of the University. (U)

20. Penn State owns and operates over 40 residence halls containing approximately 6900 rooms at its University Park Campus for approximately 12,050 students. (U)

21. The rooms in the residence halls generally are used by two or more students for sleeping, dressing, studying and socializing.

22. The students use common facilities for lavatories, study lounges, laundry, storage and organized educational and social functions. (U)

23. At the beginning of the fall academic term, there are more students residing in the residence halls than can be accommodated in regular student rooms. At that time, typically five hundred to six hundred students live in the study lounges in the residence halls throughout the campus.

24. Virtually all of the study lounges within the residence halls are occupied and used as residential living units at the beginning of the fall term.

25. During the course of the fall term and winter academic term, as regular rooms become available, students are moved from the study lounges.

26. Penn State's purpose in maintaining residence halls for students involves more than simply providing sleeping quarters for its students. Through programs and services provided to residence hall students, Penn State's goal is to enhance the students' academic experience and assist in the personal growth and development of the students.

27. Penn State conducts programs within the residence halls intended to assist students in dealing with personal problems and interests, including such matters as Alcohol Awareness, Diet and Nutrition, and Rape Prevention.

28. Penn State provides trained counselors, who are available to residence hall students for advice and counseling with respect to personal problems, academic matters and financial problems.

29. Penn State also provides formal and informal social and recreational activities for students in the residence halls. (U)

30. Arthur Constantino is the Associate Director of Residential Life Programs and is responsible, among other duties, for day-to-day supervision and administration of the programs and staff of the Residential Life Program. (U)

31. Within each residence hall building, rooms are organized on the basis of floors or parts of floors into units called a "house." The house serves as the basic residential living, social and educational unit for the students living in those rooms. (U)

32. Each house is assigned a "resident assistant" ("RA") who is a student living in that house. The RA is a member of the staff of the Office of Residential Life Programs of the University, and as compensation for these duties receives a credit for room and board charges and half of the tuition charges. (U)

33. In order to permit all of the activities which are ongoing in a residence hall to proceed in an orderly fashion, and to protect privacy and a study atmosphere, Penn State has adopted a set of regulations and procedures which control the use of the residence halls.

34. These regulations deal with (1) the establishment of "quiet hours" for study, (2) visitation within the residence halls, (3) canvassing within the residence halls, (4) fund raising by student organizations, (5) charitable solicitation by student organizations and (6) solicitation of money and sales of products and services in the residence halls.

35. Quiet hour restrictions require that all noise levels in rooms and hallways be reduced to an absolute minimum.

36. Certain areas within residence halls have predetermined quiet hour periods, while quiet hours within other areas of the residence halls are determined by a vote of the residents. The typical quiet hour period established by the vote of the residents is 7:00 p.m. to 7:00 a.m.

37. Visitors of the opposite sex must be escorted by the student resident to and from the student's room.

38. Visitors of the same sex can enter a residence hall upon an invitation from a resident.

39. On November 19, 1982, Penn State adopted a new policy as follows:

REGULATIONS FOR THE SOLICITATION OF MONEY OR THE SALE OR SOLICITATION OF SALE OF PRODUCTS OR SERVICES IN UNIVERSITY RESIDENCE HALLS

1. Definitions.

(a) A residence hall is a University-owned building which contains rooms assigned to students for sleeping, dressing, studying and socializing, and which also contains common facilities and areas used by all students assigned to such residence halls, including common means of ingress and egress, common lavatories, common study lounges, common storage areas and areas used in common for organized educational and social functions.

(b) The solicitation of a sale of products or services shall include (1) any attempt to organize a meeting in a residence hall for the purpose of a demonstration or explanation of products or services which are for sale and (2) any demonstration, explanation or distribution of literature in a residence hall concerning products or services which are for sale.

2. Except as hereinafter provided, no person (including a student), firm, business entity, charitable organization, religious organization or other organization may solicit money or sell or solicit the sale of any product or service anywhere in a residence hall.

3. A student assigned to a room in a residence hall may invite a person, firm, business entity, charitable organization, religious organization or other organization to that student's assigned room to solicit money or to sell or to solicit the sale of products or services with that student only. Such solicitation or sale must occur only in the assigned room of the student-invitor. The solicitation of money or the sale or the solicitation of a sale of products or services to any other student is prohibited anywhere in the residence hall.

4. Registered student organizations and residence hall house governments may solicit money or solicit the sale of products or services in a residence hall in accordance with the regulations governing Student Organizations at Paragraph B, *Funding and Financial Affairs of Registered Student Organizations,* subparagraph 3, *Fund Raising on Campus* and subparagraph 4, *Solicitation on Campus.*

5. Nothing in these regulations shall be deemed to preclude any solicitation or sale by mail, telephone or other communication media. (U)

40. Subparagraph 3, above, of the November 19, 1982 policy did not constitute a change in policy.

41. The new regulation of the solicitation of money and sale of products and services is different from the prior policy regulating commercial activities in only one material respect. Under the new regulations a vendor of products and services may not conduct a group demonstration, explanation, or distribution of literature concerning products or services which are for sale anywhere in a residence hall. Under the old policy a vendor could conduct such a group demonstration in a common area provided there was no solicitation to sell the product or service in that area.

42. A student may invite a vendor to that student's room to conduct a transaction with that student.

43. A vendor may solicit a sale or an invitation to a student's room by telephone. Students' telephone numbers are posted in the lobby of each residence hall.

44. A vendor may use the mail to solicit a sale or an invitation to a student's room.

45. Vendors are permitted to advertise in the campus newspaper and on the campus radio station.

46. The housing and food service contract signed by all students states as follows: "The conducting of any business enterprise for personal profit is prohibited in and around the University-operated units."

47. Residence halls are reserved for the use of the residents and their properly invited guests.

48. Under Penn State rules members of the general public are not permitted to enter the residence halls uninvited except that they may enter the lobby area to examine the list of telephone numbers of students and to call the students on the telephone.

49. A "no trespassing" sign is posted at or near the entrance of each residence hall on the Penn State Campus.

50. The sales activities of AFS which are relevant to this case relate to attempted sales of a selected number of patterns of china, crystal, silverware and cookware known as collectively as the "American Prestige Series."

51. AFS does not engage in door-to-door solicitations within the residence halls.

52. American Prestige Series goods are generally sold at demonstrations or shows attended by a student resident who acts as hostess, an AFS sales representative and a number of invited guests.

53. With respect to its sales to college students, AFS seeks out a particular college student by telephone and asks her if she would serve as hostess for an American Prestige Series show on campus.

54. This communication is performed either through AFS's central "booking" office in Bryn Mawr, Pennsylvania or through AFS's sales representative assigned to a given geographic area.

55. At the time of the initial telephone contact, a student hostess is informed that, if she serves as a hostess for the show, she will receive a holiday in Florida or Las Vegas.

56. Before the scheduled show, a student agreeing to serve as hostess for such a demonstration receives a packet of information containing a number of invitations for guests and a description of what is involved at the show.

57. The student who has agreed to serve as hostess for a demonstration is asked to distribute invitations to other students.

58. It is AFS's policy to attempt to have ten to 15 students in attendance at a sales demonstration. That number does not include men or women who have been to a prior AFS sales demonstration.

59. AFS instructs its representatives to comply with all safety, occupancy and visitation requirements within residence halls.

60. A sales demonstration put on by AFS generally proceeds in two parts: A demonstration of the American Prestige Series products including a comparison of those products with other merchandise and an explanation of why American Prestige products are superior to the other products and a sales portion where students are given an opportunity to purchase products on an installment plan basis.

61. AFS's representatives are directed to follow a "cue card" format as set forth in Trial Exhibit Pl.

62. AFS provides some consumer information in connection with its sales demonstrations with a view toward selling its products.

63. If a student decides to purchase American Prestige Series merchandise after attending an AFS presentation, the student is requested to sign a sales contract at that time. The price of a "package" of merchandise is in the approximate range of $300.00 to $800.00.

64. Generally, between ten and 20 percent of those students attending AFS sales presentations purchase merchandise.

65. An AFS sales contract contains a "code" at the bottom which consists of a number of letters. These letters and the explanation of them as set forth in the AFS manual are as follows:

"The codes are divided into four main categories. Each contract must be marked with four codes, one from each category. The codes are as follows:

Category I—Codes Describing Educational Institution
'R'—four-year college
'J'—junior college
'N'—nursing school
'V'—vocational school
Category II—Codes of Race and National Origin
'G'—white
'M'—black
'O'—Oriental
'X'—Mexican or Spanish
Category III—Codes of—Marital Status
'C'—married
'S'—not married
Category IV—Codes of Residence
'D'—dorm

'A'—apartment

'P'—with parents"

66. The classifications are used at least in part to determine which credit policy will be applied to a student purchasing AFS merchandise.

67. If a designated class of college students has a satisfactory payment record, each student within that class is eligible to have merchandise shipped before the first payment is due without meeting the AFS creditable test.

68. If a designated class of college students does not have a satisfactory payment record, a student within that class does not receive delivery of the goods until that student has established a satisfactory payment history.

69. Individuals within the class of white and oriental students in their sophomore year or later who attend a four year college or a nursing school are eligible for immediate delivery of AFS merchandise.

70. Individuals within the following classes are eligible only for deferred shipment of AFS merchandise: (a) all freshman students; (b) all junior college students; (c) all vocational college students.

71. With respect to Black, Mexican or Hispanic students attending four year colleges and nursing schools, the credit policy states that a reasonable effort should be made to have the sale made on a deferred shipment basis. However, a sales representative may offer such individuals immediate shipment if the sales representative deems it appropriate to do so under the particular circumstances.

72. The Florida vacation certificate includes only lodging in a hotel for a period of two nights and three days and does not include transportation or meals.

73. Amy Cervi is a student at Penn State residing within the residence halls, at room 355, McElwain Hall. Miss Cervi has two roommates who also reside in Room 355.

74. At sometime during the week of September 19, 1982, Miss Cervi received a telephone call from a representative of American Future Systems, Inc.

75. The AFS representative asked Miss Cervi to serve as a hostess for an AFS sales demonstration in her room and invite nine of her friends to attend.

76. The AFS representative told Miss Cervi that she would receive a free Florida vacation for serving as hostess for the AFS demonstration.

77. The AFS representative did not disclose to Miss Cervi that the vacation certificate was only for two nights and three days lodging or that transportation and meals were not included.

78. The AFS representative persuaded Miss Cervi to serve as a hostess for an AFS demonstration in her room and scheduled the demonstration for September 29, 1982.

79. AFS or its representatives scheduled 51 group presentations in Penn State's residence halls for the last two weeks of September, 1977.

80. Penn State students have been denied permission to invite AFS to conduct group demonstrations in the privacy of an individual's dormitory room despite the fact that that individual invited an AFS representative and other guests of that individual's choosing to his or her dormitory room for the specific purpose of participating in and attending the AFS presentation. (U)

81. Penn State does not permit the solicitation of money or the solicitation and sale of products and services by any person, including students, to groups of students anywhere in the residence halls.

82. As justification for its policy, Penn State claims the following: (a) such activity could invade the privacy of students; (b) such activity could disrupt students while studying or sleeping; (c) such activity could disrupt the educational and personal developmental programs of the Office of Residential Life Programs; (d) such activity could disrupt the activities of student government; (e) such activity could disrupt organized and informal social and recreational activities of students; (f) to the extent that these disruptions would occur,

they would be for a purpose unrelated to the purposes to which the residence halls are dedicated; (g) the greater the frequency of the solicitation of money and sale of products and services, the more likely that such disruptions and invasions of privacy would occur; (h) such activity could displace some of the normal activities carried on in a residence hall if a student chose not to challenge the activity (i.e., students might choose not to object to a vendor in their room or in a study lounge where they wished to study, simply to avoid a possible confrontation with the vendor and other students); (i) such activity would require Penn State to exercise controls on the activity which could divert resources and efforts from the purposes to which they are now used; (j) group solicitations are incompatible with the uses to which the residence halls are dedicated; (k) the group solicitation and sale of products and services has the potential for deception, fraud and over-reaching.

83. The real concern of Defendants has to do with monitoring the "high pressure salesmanship" of employees of AFS.

84. Penn State's policy allows one-on-one solicitation while prohibiting group presentations for solicitation.

85. There is no practical distinction between the one-on-one presentation as opposed to the group presentation in terms of safety, security, and other purported state interests.

86. The potential for an AFS sales demonstration to disturb a quiet study atmosphere in the residence halls is substantially less than the potential to cause such disturbance of activities currently permitted by Penn State and engaged in by students with some frequency.

87. Loud, boisterous and disturbing activities which occur in the residence halls include "keg parties," water fights, bull or rap sessions, "surf's up", birthday parties in the showers, "pennying in" occupants of a dormitory room and loud noise levels of stereos.

## III. Discussion.

This is the second case before the Court involving AFS's challenge of Penn State's policies relating to commercial activities in its dormitories. In the first lawsuit, judgment was granted in favor of Penn State upholding its regulations against an attack that they violated AFS's First Amendment rights. *American Future Systems, Inc. v. Pennsylvania State University,* 464 F.Supp. 1252 (M.D.Pa.1979), *aff'd* 618 F.2d 252 (3d Cir.1980) (*American Future Systems I*).

AFS is a corporation whose principal business is the sale of cookware, china, crystal, and silverware through demonstrations of its merchandise at colleges throughout the United States. In its original complaint in this lawsuit, AFS sought at the invitation of individual students, to be permitted to present sales demonstrations in common areas within Penn State's residence halls, to disseminate commercial information to groups of students through sales demonstrations in individual dormitory rooms, and to consummate sales to students in the residence halls.

During the pendency of the *American Future Systems I* litigation, and at the beginning of this lawsuit, Penn State's policy was such that:

(1) AFS may conduct group demonstrations in specified common areas of each residence hall; (2) following those demonstrations a student may invite an AFS representative to the student's room to purchase AFS goods; (3) AFS is free to solicit invitations to individual students' rooms at the group demonstrations or by telephone or mail; (4) AFS is not permitted to conduct group demonstrations in an individual student's dormitory room; (5) AFS is not permitted to consummate sales in individual dormitory rooms to a purchaser other than the occupant of the room; (6) AFS is not permitted to conduct group solicitations of sales in the common areas of residence halls; and (7) AFS is not permitted to consummate commercial transactions in the common areas of residence halls.

*American Future Systems v. Pennsylvania State University,* 522 F.Supp. 544, 547 (M.D. Pa.1981), *citing American Future Systems v. Pennsylvania State University,* 510 F.Supp. 983, 985 (M.D.Pa.1981) (*American Future Systems II*).

After the Court of Appeals issued its opinion in *American Future Systems II* reversing this Court's grant of summary judgment, *American Future Systems, Inc. v. Pennsylvania State University,* 688 F.2d 907 (3d Cir.1982), the Court of Appeals decided the case of *International Society for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority,* 691 F.2d 155 (3d Cir.1982) (*Krishna*). In *Krishna,* the Court of Appeals addressed the question whether the International Society for Krishna Consciousness, a religious group, was entitled to distribute literature and solicit donations in the Meadowlands Sports Complex in New Jersey (Meadowlands). The central issue in *Krishna* was whether or not the Meadowlands was a "public forum." After reviewing a line of Supreme Court cases, the Court of Appeals concluded that the Meadowlands was not a "public forum." *Krishna,* 691 F.2d at 161. Finding the policy at the Meadowlands precluding distribution of literature and solicitation of donations to be a "reasonable" restriction based on substantial state interests, the Court of Appeals upheld the policy. *Krishna,* 691 F.2d at 163.

After learning of the *Krishna* decision, Penn State concluded that its dormitories were also not "public forums" for First Amendment purposes. *See also American Future Systems I,* 618 F.2d 252, 256 (3d Cir.1980) ("We believe that these facts demonstrate that the area at issue here, the residence halls at Penn State, does not constitute a 'public forum' under the First Amendment."). Consistent with this view that its dormitories are not "public forums," on November 19, 1982, and on the eve of this Court's hearing on Plaintiffs' motion for a preliminary injunction, Penn State issued new regulations which prohibited *all* commercial solicitation activities in the "common areas" of its residence halls. *See* Regulations for the Solicitation of Money or the Sale or Solicitation of Sale of Products or Services in University Residence Halls, promulgated November 19, 1982, (hereinafter "Dormitory Solicitation Regulations" or "Regulations") at ¶¶ 1, 2.

While all "common area" commercial activities are effectively prohibited by Penn State's Dormitory Solicitation Regulations, the Regulations do not change Penn State's former policy regarding commercial activities in an individual student's room. *Compare* Dormitory Solicitation Regulations at ¶ 3 *with American Future Systems II,* 552 F.Supp. 544, 547 (M.D.Pa.1981). Thus, with regard to individual student rooms, Penn State's policies permit a student assigned to a room to invite a representative of a business to that student's room to demonstrate and sell commercial products to that student only. Group demonstrations and sales in an individual student's room are prohibited.

As a result of the promulgation of Penn State's new Dormitory Solicitation Regulations, AFS and the student Plaintiffs have determined not to litigate "common rooms" issue in this case. *See* Petition of Plaintiffs for Leave to Amend or Supplement Complaint and Motion for Preliminary Injunction, Doc. No. 150, filed November 29, 1982, and Orders granting Petition, Doc. Nos. 175, 176, filed December 2, 1982. Presently, the sole issue in this litigation is whether or not Penn State's Dormitory Solicitation Regulations with respect to limitation of commercial activities in individual students' dormitory rooms violate the Plaintiffs' constitutional rights. The Plaintiffs have challenged the procedure by which Penn State's November 19, 1982 Dormitory Solicitation Regulations were promulgated. In particular, the Plaintiffs urged at the preliminary injunction hearing that the Regulations be stricken because there was no opportunity for students to participate in the drafting of the Regulations. Because the particular sections of the Regulations now at issue are not different from the prior regulations, and because there was no challenge to the process of promulgation of the prior regulations, this argument of the Plaintiffs may summarily be rejected.

Presently before the Court is the motion of the Plaintiffs for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, filed October 18, 1982, and amended December 2, 1982, requesting that the Defendants be enjoined from enforcing the Dormitory Solicitation Regulation with respect to commercial activities within individual students' dormitory rooms. It is the position of the Plaintiffs that under the rulings of the Court of Appeals in *American Future Systems I,* 618 F.2d 252 (3d Cir.1980) and *American Future Systems II,* 688 F.2d 907 (3d Cir.1982), they are entitled to the declaratory judgment and other relief sought in the complaint. It is not appropriate at this time for the Court to determine if the Plaintiffs are correct. At this juncture, it is only proper for the Court to determine whether or not Plaintiffs have satisfied the requirements for the issuance of a preliminary injunction granting the relief sought in the complaint.

The standards for a preliminary injunction that maintains the *status quo* are set forth in *Continental Group, Inc. v. Amoco Chemical Corp.,* 614 F.2d 351, 356–57 (3d Cir.1980), as follows:

> To support a preliminary injunction, the moving party must demonstrate that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is a reasonable probability of eventual success on the merits. In addition, the Court must weigh the possibility of harm to the nonmoving party as well as to any other interested persons and, when relevant, harm to the public. (Footnotes omitted).

*See Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3d Cir.1974); 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2943 (1980). In this case the Plaintiffs seek not to maintain the *status quo,* but rather to alter the *status quo* to permit individual student Plaintiffs to invite AFS and other commercial solicitors to conduct group demonstrations and sales of merchandise in individual student rooms. In a situation in which a litigant seeks a preliminary injunction that alters the *status quo* pending final judgment, "the burden on the moving party is particularly heavy." *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir. 1980), *citing United States v. Spectro Foods Co.,* 544 F.2d 1175, 1181 (3d Cir.1976). In essence, the equities must weigh decidedly in Plaintiffs' favor. *Schlesinger v. Carlson,* 489 F.Supp. 612, 619 (M.D.Pa.*1980*). *See American Future Systems I,* 510 F.Supp. 983, 985 (M.D.Pa.1981).

## A. Irreparable and Immediate Harm.

To support the grant of preliminary injunctive relief, the moving party must show that irreparable harm will occur if preliminary relief is denied. *E.g. Continental Group, Inc. v. Amoco Chemical Corp.,* 614 F.2d 351, 356–57 (3d Cir.1980). "The danger of irreparable injury to the plaintiffs which we must evaluate is that harm which might ensue *during the pendency of the litigation* if we deny a preliminary injunction now but later decide on a fuller record that permanent relief is appropriate." *Local No. 1 v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 419 F.Supp. 263, 287 (E.D.Pa.1976) (emphasis in original), *citing* O. Fiss, *Injunctions* 168 (1972).

### 1. AFS's rights.

AFS's rights in this litigation are concededly derivative. In essence, AFS's rights exist only if the individual student Plaintiffs have and exercise the right to invite AFS into their dormitory rooms to conduct commercial activities. Thus, injury to AFS alone from being denied the ability to consummate business transactions will not be sufficient to justify issuance of a preliminary injunction. Indeed, it appears that AFS takes the position in this litigation, at least with respect to the present motion for a preliminary injunction, that the rights of the individual students, and not those of AFS are primarily of the Court's concern. *See* Plaintiffs' Trial Brief, Doc. No. 152, filed November 29, 1982; Plaintiffs' Proposed Preliminary Injunction Order.

It is also questionable whether AFS could show the requisite "irreparable harm." To

the extent that AFS has suffered compensable financial loss, AFS may be made whole by payment of damages and is not "irreparably" injured. *E.g. Oburn v. Shapp,* 521 F.2d 142 (3d Cir.1975); *Supermarket Films, Inc. v. Sylvania Electric Products, Inc.,* 321 F.Supp. 855 (W.D.Pa. 1971). *See also United States v. American Friends Service Committee,* 419 U.S. 7, 95 S.Ct. 13, 42 L.Ed.2d 7 (1974) (irreparable injury is a prerequisite to traditional equity jurisdiction to grant injunctive relief.) AFS also asserts that its constitutional rights have been and are being violated. In particular, AFS argues that the Court of Appeals decision in *American Future Systems II,* 688 F.2d 907, 910–913 (3d Cir.1982) recognizes that AFS's constitutional rights are violated by Penn State's regulations regarding commercial activities in the dormitories. A close reading of the decision of the Court of Appeals reveals that only the question whether AFS had the constitutional right to present its materials in the "common areas" of Penn State's residence halls was addressed. "[T]he only issue is whether Penn State may censor the content of AFS's commercial speech conducted in the dormitory *common rooms* where AFS has been permitted by the University to conduct its sales demonstrations." *American Future Systems II,* 688 F.2d at 912 (emphasis added). As a result of the amendment of the complaint in this case, the "common rooms" issue is no longer involved in this litigation. Even with respect to the "student rooms" issue, AFS contends that its constitutional rights are implicated. Quite clearly, under the Dormitory Solicitation Regulations AFS is entitled to present the entirety of *its presentation within the confines of a student's room.* Thus, the content of AFS's speech in a student's room is not limited. The only potential constitutional "right" which AFS might have in the context of its presentation in a student's room would relate to the "right" to have a certain audience, namely both the student "hostess" and the persons whom she invites, present for AFS's presentation. The Court seriously questions whether this is a "right" of AFS at all.

### 2. The Student Plaintiffs' Rights.

The student Plaintiffs residing in the residence halls contend they have the constitutional right to serve as host or hostess for and participate in informational and sales demonstrations in their private dormitory rooms, including the right to complete a sales contract at that time in a group setting. With respect to the restrictions Penn State's Dormitory Solicitation Regulations place on the use to which the students may put their dormitory rooms, the students invoke their free speech, associational, privacy, and due process rights as well as certain claimed rights under Section 504–A of the Pennsylvania Landlord Tenant Act, 68 P.S. § 250.554.

The students' claim of interference with their privacy rights was expressly rejected by the Court of Appeals in *American Future Systems II.* Therein, the Court of Appeals stated that it was "unwilling to extend the constitutional right of privacy to commercial transactions [in students' dormitory rooms] completely unrelated to fundamental personal rights..." 688 F.2d at 915–16. Furthermore, Penn State's Dormitory Solicitation Regulations expressly permit AFS to give its presentation, in entirety, to a student in his or her dormitory room on a one-on-one basis. This rule effectively grants to all students the privilege of hearing AFS's presentation. Thus, to the extent the students claim their right merely to listen to AFS's presentations is being limited, the Court does not find the students to be injured "irreparably."

The Court must, nonetheless, determine whether the students' First Amendment speech and associational rights are otherwise likely violated by the Penn State Dormitory Solicitation Regulations and, if so, whether the students suffer irreparable injury. It is likely that the free flow of ideas resulting from attendance at group commercial demonstrations and solicitations is protected by the First Amendment. The right to serve as host or hostess for such demonstrations is also likely protected.

The concept of irreparable injury is closely related to adequacy of a remedy at law. *E.g. Oburn v. Shapp,* 521 F.2d 142 (3d Cir. 1975); *Danielson v. Local 275,* 479 F.2d 1033 (2d Cir.1973). Given the intangible nature of a constitutional right, it is often said that such a right is not capable of remedy in damages. *E.g. Sambo's of Ohio, Inc. v. City Council of City of Toledo,* 466 F.Supp. 177, 181 (N.D.Ohio 1979), *citing Basista v. Weir,* 340 F.2d 74 (3d Cir.1965). This is especially the case where the violation of the constitutional right does not cause actual monetary damages. Unlike AFS, the student Plaintiffs probably cannot claim any financial injury resulting from Penn State's policies. Furthermore, the amount of time a student spends in a residence hall is limited. Indeed, many of the original student Plaintiffs, having graduated from Penn State or moved from its residence halls, probably have no remedy at all. Thus, given that delay in granting relief might well decrease the quality of the relief or render it ineffective entirely, the student Plaintiffs cannot wait for a full hearing on the merits in this case. For all of these reasons, this Court is convinced that the harm to the student Plaintiffs is sufficiently immediate and irreparable in nature that injunctive relief is proper.

B. Likelihood of Success on the Merits.

An essential element of the student Plaintiffs' request for a preliminary injunction is that they demonstrate a "reasonable probability of eventual success on the merits." *Continental Group, Inc. v. Amoco Chemical Corp.,* 614 F.2d 351, 356–57 (3d Cir.1980).

There was, in the view of the Court of Appeals, an insufficient record to determine whether or not Penn State's Dormitory Solicitation Regulations with respect to group commercial solicitation in students' private dormitory rooms served "significant governmental interests" and nonetheless left open "ample alternative channels for communication." *American Future Systems II,* 688 F.2d at 915, *citing Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647–48, 101 S.Ct. 2559,

2563–64, 69 L.Ed.2d 298 (1981). The Court of Appeals did not, therefore, reach the question whether the Regulations are valid. *American Future Systems II,* 688 F.2d at 915. On the Plaintiffs' motion for a preliminary injunction, this Court need not, of course, reach a definitive conclusion as to whether or not Penn State's Dormitory Solicitation Regulations regarding commercial activity in individual students' dormitory rooms violate the students' constitutional rights. The Court need only determine that there is a "reasonable probability" of such a result.

 It is well established that the First Amendment does not guarantee the rights of speech and association at all times and places or in any manner that may be desired. *E.g. Adderley v. Florida,* 385 U.S. 39, 47–48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966); *Poulos v. New Hampshire,* 345 U.S. 395, 405, 73 S.Ct. 760, 766, 97 L.Ed. 1105 (1953). Speech and associational rights, like all other First Amendment rights, are subject to reasonable time, place, and manner restrictions. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The Supreme Court has "often approved restrictions [on the time, place, and manner of First Amendment activities] provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in doing so they leave open ample alternative channels for communication of the information." *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 647–48, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 *quoting Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

 Penn State's original Dormitory Solicitation Regulations with respect to "common room" activities were "content based" regulations which are, absent a compelling state interest, prohibited. *American Future Systems II,* 688 F.2d 907 (3d Cir.1982). *See Central Hudson Gas & Electric Corp. v.*

*Public Service Commission,* 447 U.S. 557, 564–67, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341 (1980); *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980) (restrictions may not ordinarily be based upon either the content or subject matter of the speech.). Because Penn State's Dormitory Solicitation Regulations with respect to commercial activities in individual students' dormitory rooms permit the entirety of AFS's presentation to be made, the parties appear to agree that the regulations are not content-based. By definition, Penn State's Dormitory Solicitation Regulations distinguish between commercial and traditional first amendment free speech. However, such a distinction is not what is meant by "content-based" and has uniformly been upheld. *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978) ("We have not discarded the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. . . .") *See also Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); *American Future Systems. I,* 618 F.2d at 257–59.

■ Penn State's Dormitory Solicitation Regulations with respect to commercial activities are void unless they "leave open ample alternative channels for communication of information." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. at 771, 96 S.Ct. at 1830. There is no doubt that Penn State's dormitory residents have ample opportunity, albeit on a one-on-one basis, to receive the presentation of AFS and other commercial solicitors. Student dormitory residents may also, without apparent limit, invite other students to their rooms. However, Penn State explicitly prohibits group demonstrations in its dormitories. There has been no evidence that Penn State provides "ample alternative channels" where the substance of communication which exists at the group demonstrations would be permitted.

■ Even assuming that sufficient "alternative channels" for communication of the information exist Penn State's time, place and manner regulations will be upheld only if they serve a "significant governmental interest". *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. at 771, 96 S.Ct. at 1830. *See Grayned v. City of Rockford,* 408 U.S. at 108, 92 S.Ct. at 2298. At the hearing, Penn State advanced a variety of purported justifications for its Dormitory Solicitation Regulations with respect to commercial activity in students' dormitory rooms. According to Penn State, regulation of such commercial activity is proper because (a) such activity could invade the privacy of students; (b) such activity could disrupt students while studying or sleeping; (c) such activity could disrupt the educational and personal developmental programs of the Office of Residential Life Programs; (d) such activity could disrupt the activities of student government; (e) such activity could disrupt organized and informal social and recreational activities of students; (f) disruptions, to the extent that they occur, would be for a purpose unrelated to the purpose for which residence halls are dedicated; (g) the greater the frequency of the solicitation of money and sales of products and services, the more likely disruptions would occur; (h) such activity could displace some of the normal activities carried on in a residence hall; (i) such activity would require Penn State to exercise controls on the commercial activities which could divert resources and efforts from the purposes to which they are now used; (j) group solicitations and sales are incompatible with the uses to which the residence halls are dedicated; and (k) group solicitations and sales have the potential for deception, fraud, and overreaching.

Penn State's enunciation of its alleged "significant governmental interest" is unconvincing. Penn State's Dormitory Solicitation Regulations clearly allow a dormitory resident to invite to his room, expressly for purposes of commercial solicitation, any

person, business, or commercial firm. A dormitory resident may also invite unlimited numbers of students to his room. However, Penn State finds a combination of a sales representative and a large number of students in a student's room to be so invidious that such a combination is prohibited by Penn State's Dormitory Solicitation Regulations. This position is illogical and does not serve any legitimate governmental interest.

First, Penn State expresses concern over the invasion of students' privacy rights. Because these privacy rights are individual rights of the students, it is absurd to think that these rights could not be waived by the students. Second, with respect to disruption of students while studying or sleeping, there appear to be many "permitted" activities in the dormitories which are substantially more disruptive. Furthermore, there is no evidence that AFS or any other commercial organization would refuse to comply with reasonably drafted regulations to prevent such disruption. With respect to the concern of Penn State that group solicitations could disrupt the educational and personal development programs in the dormitories, no such potential for disruption has been demonstrated. This justification seems particularly contrived where business and solicitation activities might well be just the sort of "life training" which should take place in a dormitory. The Court is unable to envision a situation where group solicitation activities of the sort contemplated by AFS would disrupt student government or either organized or informal social and recreational activities. Penn State is concerned that the imagined disruptions are inconsistent with the purposes to which residence halls are dedicated and that greater frequency of solicitation activities would lead to such disruptions. This "floodgate" argument is not persuasive in light of the evidence.

■ In sum, Penn State's concerns are not valid. The real concern of Penn State appears more to be related to the "high pressure" sales tactics of AFS than group solicitation in general. This concern of Penn State may not properly be addressed

by a wholesale limitation on group solicitation activities. There are, no doubt, appropriate avenues of relief should AFS's commercial activities be proven either illegal or improper.

As drafted, Penn State's regulations do not address the anticipated problems. Significantly, Penn State's present regulations are not reasonably drafted to prohibit disruptive activities but, instead, presume disruption will result. Because there is no practical distinction between one-on-one solicitations and group solicitations in terms of safety, security, and other purported state interests, a wholesale preclusion of group solicitations is probably grossly overbroad.

For all of the foregoing reasons, Penn State will likely not establish at trial that its Dormitory Solicitation Regulations "serve a significant governmental interest." There is, therefore, a reasonable probability that the students will succeed on the merits in this litigation.

C. Balancing of Equities and Protection of the Public Interest.

■■ The Court must consider the possibility of harm to the non-moving party and may, in appropriate situations, consider harm to the public interest. *Continental Group, Inc. v. Amoco Chemical Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980). Because this is an affirmative injunction, as opposed to one retaining the *status quo*, the equities must weigh decidedly in the students' favor in order for them to prevail in their request for injunctive relief. *Schlesinger v. Carlson*, 489 F.Supp. 612, 619 (M.D.Pa.1980). Penn State has not advanced any legitimate interests which would justify its Dormitory Solicitation Regulations with respect to commercial activities in individual students' rooms. Penn State's proffered justifications do not appear sound. Thus, the equities would appear not to weigh in Penn State's favor.

At the same time, the student Plaintiffs have identified substantial and legitimate constitutional rights which are being impinged upon by Penn State's Regulations. This Court has no doubt as to the sincerity

of the student Plaintiffs in this litigation. Because the students' injuries cannot be calculated in terms of money damages and the students' tenure in the Penn State residence halls is limited in duration, the equities, therefore, decidedly weigh in favor of the students.

■ Penn State is a public university whose residence halls house over 12,000 students. Because the challenged regulations directly affect the free speech and associational rights of all of those students the public interest is, therefore, decidedly implicated in this case. Penn State's correlative interest in attempting to protect its students from sharp business practices has expressly and consistently been rejected. First, the principle of *in loco parentis* appears no longer to apply to college students. *Bradshaw v. Rawlings,* 612 F.2d 135, 139 (3d Cir.1979) ("College students today are no longer minors; they are regarded as adults in almost every phase of community life."). Second, the public interest in regulating activities within a dormitory room is limited. A college dormitory room is the equivalent of a student's "home away from home," *American Future Systems I,* 464 F.Supp. at 1262, and students have at least a modicum of expectation of privacy in their dormitory rooms. *E.g. Piazzola v. Watkins,* 442 F.2d 284, 289–90 (5th Cir. 1971). *But see American Future Systems II,* 688 F.2d at 915–16. ("We are unwilling to extend the constitutional right of privacy [of a student in his dormitory room] to commercial transactions completely unrelated to fundamental personal rights.")

In sum, the public interest would be served by issuance of an injunction.

D. Scope of Relief.

The Plaintiffs have requested a preliminary injunction directing the Defendants "to permit persons residing in University residence halls to have business invitees and social guests of their choosing come to their assigned room(s) for any lawful purpose, at reasonable times and subject to other health, safety, security, fire, occupancy, and/or visitation regulations, as applied to social guests under present University regulations." In essence, the Plaintiffs request that the Dormitory Solicitation Regulations regarding commercial solicitation in individual students' dormitory rooms be deemed unenforceable as against *all* students residing in Penn State's residence halls.

As stated previously, a preliminary injunction is only appropriate where the movants have established a reasonable probability of ultimate success on the merits in the litigation. *Continental Group v. Amoco Chemical Corp.,* 614 F.2d at 356–57. The normal function of preliminary injunctive relief is to maintain the *status quo* and to ensure that the movants suffer no further injury pending a full hearing on the merits. *E.g. Triebwasser & Katz v. American Telephone and Telegraph Co.,* 535 F.2d 1356 (2d Cir.1973); *King v. Saddleback Junior College Dist.,* 425 F.2d 426 (9th Cir.1970), *cert. denied,* 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971). In order adequately to protect the non-moving party, in no event should preliminary injunctive relief be issued beyond relief to which the movants would be entitled should they ultimately prevail in the litigation.

The Plaintiffs' request for a declaratory judgment is based on the Declaratory Judgment Act, 28 U.S.C. § 2201. Section 2201 provides that "In a case of actual controversy . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . ." The "case or controversy" requirement under Section 2201 is no less stringent than in any other federal lawsuit. *Alvater v. Freeman,* 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943); *United States v. West Virginia,* 295 U.S. 463, 55 S.Ct. 789, 79 L.Ed. 1546 (1935).

The issue being litigated at this juncture is whether or not Penn State's Dormitory Solicitation Regulations may be enforced to preclude dormitory residents from inviting both commercial sales representatives and other students simultaneously to the student's dormitory room for purposes of a group demonstration and sale. It is quite clear that the Declaratory Judgment Act may not be used to secure a judicial deter-

mination of moot questions, *Aetna Life Insurance Co. of Hartford v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). With respect to those individual Plaintiffs who are no longer Penn State students or who are no longer residing in Penn State's residence halls, the controversy in this litigation is moot. Those students lack a present legally cognizable interest in the outcome of this lawsuit and there is no likelihood that any "injury" to those students is capable of repetition yet evading review. *Weinstein v. Bradford,* 423 U.S. 147, 148–49, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), *citing Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Winsett v. McGinnis,* 617 F.2d 996, 1003 (3d Cir.1980), *cert. denied sub nom. Anderson v. Winsett,* 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981).

The only student Plaintiffs who have a "live" controversy are those named student plaintiffs who are presently residing in Penn State's residence halls and who desire to serve as host or hostess for a group demonstration and solicitation. Kevin Graves is the only such named student plaintiff who has standing to sue and there is some doubt that he wishes to host one of the demonstrations although he obviously is serious about asserting his right to do so.

On the first day of the preliminary injunction hearing, December 2, 1982, Plaintiffs filed an oral application for Marc Bogutz, a Penn State student who resides in a fraternity house, and Kathryn Johnson, a freshman Penn State student who resides in a Penn State dormitory, to be allowed to intervene as Plaintiffs. Because there was objection to the request and because the Defendants were caught by surprise, the Court declined to grant the motion. Plaintiffs were directed to file a formal written motion with a modest supporting brief if they desired to pursue the matter. On December 14, 1982, Plaintiffs filed a motion and memorandum of law to join Kathryn Johnson as an additional Plaintiff. The motion is not yet ripe for disposition by the Court and, therefore, will not be acted upon at this time. Apparently recognizing that Marc Bogutz had no standing, Plaintiffs have not filed a motion that he be added as a party Plaintiff.

This lawsuit was not brought as a class action, and there is no request pursuant to Rule 23 for certification of a class of student Plaintiffs residing in Penn State's residence halls. Because there is no student plaintiff class, relief to any person or group of persons beyond those who have actual standing would be improper. *Cf. Workman v. Mitchell,* 502 F.2d 1201 (9th Cir.1974).

For the foregoing reasons, absent class certification or a request for such certification, *Kahan v. Rosensteil,* 424 F.2d 161, 169 (3d Cir.)., *cert. denied, sub nom. Glen Alden Corp. v. Kahan,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), injunctive relief will be granted only with respect to Kevin Graves.

### IV. Conclusions of Law.

1. Kevin Graves, the only named Plaintiff who resides in Penn State's residence halls, is the only Plaintiff who has standing to request preliminary injunctive relief.

2. Kevin Graves would be irreparably harmed if a preliminary injunction is not issued.

3. Kevin Graves has a reasonable probability of succeedings on the merits in this litigation.

4. The "equities" weigh heavily in favor of granting preliminary injunctive relief in favor of Kevin Graves.

5. The public interest will be served by granting preliminary injunctive relief to Kevin Graves.

An appropriate order will be entered.

### ORDER

1. The motion of the Plaintiffs for leave to present additional relevant information to the Court is denied.

2. The motion of the Plaintiffs to file supplemental findings of fact is granted.

3. The motion of the Plaintiffs for a preliminary injunction is granted in part and denied in part.

4. The motion of Kevin Graves for a preliminary injunction is granted.

5. The request of all other Plaintiffs for preliminary injunctive relief is denied.

6. Pending final hearing or further order of this Court, Defendants John W. Oswald, M. Lee Upcraft, the Board of Trustees of the Pennsylvania State University, Pennsylvania State University, and its employees and agents, are hereby enjoined from enforcing Paragraph 3 of the "Regulations for the Solicitation of Money or the Sale or Solicitation of Sale of Products or Services in University Residence Halls," promulgated November 19, 1982, with respect to Kevin Graves, the only named individual student Plaintiff who resides in Penn State's residence halls.

7. This case is hereby placed on the Williamsport July 1983 trial list for disposition on the merits.

8. A settlement conference will be held in this case in Williamsport on Wednesday, June 1, 1983, at a time to be announced.

9. All discovery in this case shall be completed on or before June 15, 1983.

10. A final pre-trial conference will be held in this case in Williamsport on Tuesday, July 5, 1983.

11. Juries will be drawn in Williamsport on Wednesday, July 6, 1983 for those cases on the July 1983 list to be tried by a jury.