752 F.2d 854
 53 USLW 2350, 22 Ed. Law Rep. 716
 AMERICAN FUTURE SYSTEMS, INC., Steven Brubaker, Richard J.
Wingert, W. Bruce Del Valle, John D. Varsics,
Dennis C. Habacher, John B. Spiller,
Kathy Johnson, Kevin Graves, Appellees,
v.
The PENNSYLVANIA STATE UNIVERSITY, Board of Trustees of the
Pennsylvania State University, John W. Oswald, individually
and as President of the Pennsylvania State University, M.
Lee Upcraft, individually and as Director of Residential
Life Programs of the Pennsylvania State University, Appellants.
 No. 83-3412.
 United States Court of Appeals,
Third Circuit.
 Argued April 23, 1984.
Decided Dec. 28, 1984.
Rehearing and Rehearing In Banc Denied Feb. 6, 1985.
 
 Henry T. Reath (argued), James T. Moughan, Duane, Morris & Heckscher, Philadelphia, Pa., for appellees.
 Delbert J. McQuaide (argued), R. Mark Faulkner, McQuaide, Blasko, Schwartz, Fleming & Faulkner, Inc., State College, Pa., for appellants.
 Carl N. Martin, II, Philadelphia, Pa., for amici curiae--Com. Ass'n of Students.
 Virginia Lynn Hogben, Philadelphia, Pa., for amicus curiae--American Civil Liberties Foundation of Pa.
 Before ADAMS and BECKER, Circuit Judges, and SAROKIN, District Judge*.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This appeal presents an important first amendment question concerning the power of a state university to regulate activities in student dormitories that it operates in conjunction with its educational programs. Specifically, we are confronted with a challenge to the constitutionality of a regulation enacted by Pennsylvania State University ("Penn State") prohibiting group sales demonstrations in students' dormitory rooms. The regulation has operated in this case, now before us for the third time,[1] to bar several Penn State students from attending or hosting sales demonstrations conducted by American Future Systems ("AFS"), a corporation that conducts such sales demonstrations as a means of marketing its china and cookware. After trial, the district court held that the regulation was unconstitutional and entered an order enjoining Penn State from continuing to ban AFS sales demonstrations in the dormitories. For the reasons set forth below, we hold that the regulation does not unconstitutionally infringe upon either the right of students to receive commercial information in association with other students or upon the right of AFS to disseminate such commercial information. Accordingly, we reverse the judgment of the district court.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 2
 The plaintiffs-appellees in this action are AFS and a number of Penn State students.[2] AFS is in the business of selling cookware, china, crystal, and silverware, primarily to college students.[3] Its primary sales device is the on-campus demonstration, which is similar to the well-known Tupperware party. An AFS representative meets with a group of students in their dormitory, gives a presentation extolling the virtues of AFS's merchandise, and attempts to make sales at the end of the presentation. The students are encouraged to sign an installment sales contract at the time they agree to make the purchase.
 
 
 3
 AFS actively recruits students to host its demonstrations. An AFS sales representative contacts a particular college student, usually a woman, and asks if she will host an on-campus demonstration.[4] The student is informed during the initial phone conversation that, if she hosts an AFS demonstration, she will receive a free vacation in Florida or Las Vegas.[5] If a student agrees to host a demonstration, she receives a packet of information containing a number of invitations for guests, which she is asked to distribute to other students, and a description of what is involved in the show.
 
 
 4
 AFS seeks to have about ten to fifteen female students at each demonstration.[6] This "target" size is evidently based on AFS's experience that ten to twenty percent of the students at a particular demonstration usually agree to purchase AFS products. If fewer than the optimal number of students are present five minutes before the demonstration is scheduled to begin, the AFS representative asks those in attendance to attempt to round up others. The representative informs them that there will be a "door prize" of a trip to Florida if at least ten women are present,[7] and tells them that a donation will be made to "Save the Children" for each person at the show. The AFS representative does not solicit attendance by knocking on doors herself unless permission to do so has been granted by college officials.
 
 
 5
 Once the students are present, the AFS representative conducts the demonstration, which is set in the context of a discussion of the post-college lifestyle of students. The AFS representative demonstrates the "American Prestige Series" products, compares them with similar merchandise, and explains the advantages of AFS's wares.[8] Following the demonstration, the representative asks whether any of the students are interested in purchasing the products, and attempts to get those students to sign purchase agreements at the meeting. If a student agrees to buy, the representative fills out a contract that contains a code describing the student's educational institution, race or national origin, marital status, and type of residence. AFS uses this information to determine the credit terms to be extended to the student.[9]
 
 
 6
 When AFS first sought to conduct its demonstrations in Penn State's dormitories in the fall of 1977, the demonstrations were prohibited by the university's general policy against commercial solicitation.[10] Nonetheless, Edward M. Satell, president of AFS, directed his sales representatives to begin booking demonstrations at Penn State.[11] A number of shows were, in fact, conducted, some being interrupted by Penn State officials who asked the AFS representative to leave. Satell asserted that the university's policy was unconstitutional in letters to Penn State officials.
 
 
 7
 In response to AFS's actions, Penn State refined its policy on commercial solicitation. The new policy restricted but did not completely prohibit AFS's demonstrations in university dormitories. The district court described the new policy in the following way:
 
 
 8
 (1) AFS may conduct group demonstrations in specified common areas of each residence hall; (2) following those demonstrations a student may invite an AFS representative to the student's room to purchase AFS goods; (3) AFS is free to solicit invitations to individual students' rooms at the group demonstrations or by telephone or mail; (4) AFS is not permitted to conduct group demonstrations in an individual student's dormitory room; (5) AFS is not permitted to consummate sales in individual dormitory rooms to a purchaser other than the occupant of the room; (6) AFS is not permitted to conduct group solicitations of sales in the common areas of residence halls; and (7) AFS is not permitted to consummate commercial transactions in the common areas of residence halls.
 
 
 9
 AFS, 553 F.Supp. at 1275; see also American Future Systems, Inc. v. Pennsylvania State University, 522 F.Supp. 544, 547 (M.D.Pa.1981); American Future Systems, Inc. v. Pennsylvania State University, 510 F.Supp. 983, 985 (M.D.Pa.1981). In addition, Penn State did not limit in any way the availability of other methods of communication between AFS and the students. AFS was free to solicit students directly by telephone and mail, and indirectly by advertising in the student newspaper and on the student radio station.[12] The company was also able to hold its demonstrations at the Nittany Lion Inn--a motel on the Penn State campus--or elsewhere in State College, Pennsylvania.[13]
 
 
 10
 Dissatisfied with Penn State's interpretation of its regulations, AFS filed suit, alleging that Penn State's regulations infringed its constitutional right to free speech, and the right of students to hear that speech. The focus of AFS's challenge was on those aspects of the regulations permitting it to conduct demonstrations in the common areas of the dormitories but prohibiting it from consummating sales at the end of these presentations. The district court, after a trial, concluded that AFS could not raise the constitutional rights of the students, who were not then parties to the litigation, see supra note 2,[14] and that Penn State's regulations did not violate AFS's first amendment rights.[15] The court's decision turned on the availability of other channels for AFS to communicate product information to the students, including demonstrations that did not involve attempts to consummate immediate sales, and on the distinction between "commercial speech" and "soliciting sales."[16] The court held that Penn State's interests in protecting the privacy of dormitory residents, and in protecting students against "deceptive or potentially coercive practices," justified regulations that made it "more difficult for students to obtain the type of information about commercial products which [AFS] seeks to distribute." AFS, 464 F.Supp. at 1262.
 
 
 11
 In American Future Systems, Inc. v. Pennsylvania State University, 618 F.2d 252 (3d Cir.1980) ("AFS I "), we affirmed the district court. We concluded that the common areas of the Penn State dormitories are not "public forums" for first amendment purposes, and that "Penn State has articulated a legitimate interest"--the preservation of the educational and residential atmosphere of the dormitories--"which support[s] its ban on group sales activity in the dormitories." Id. at 257. We also held that Penn State's distinction between group political speech, which it permitted, and "group commercial speech," which it restricted, was not "arbitrary, capricious, or invidious," and thus was constitutional. Id. at 258-59.
 
 
 12
 Following our decision in AFS I, AFS requested permission from Penn State to hold demonstrations in individual students' rooms; its position, apparently, was that the constitutionality of Penn State's regulations regarding activities in the students' own rooms was left open by the AFS I ruling. Penn State denied AFS's request on the basis of its regulations. AFS then proposed that it be permitted to present group demonstrations in the common areas of the residence halls, although it agreed that, after AFS I, it had to abide by the University's requirement that actual sales be consummated only on a one-on-one basis in each student's room. The company forwarded to Penn State the printed text of its proposed group presentation. The University objected to certain parts of the presentation, characterizing these parts as "outright group commercial solicitation." Penn State insisted that the parts of the presentation outlining the terms on which the AFS merchandise was being offered be excised from the show.[17]
 
 
 13
 Now joined by a group of Penn State students, AFS filed a new complaint, asserting that AFS had a right to conduct its entire demonstration, including those portions aimed at conveying information directly relevant to the sale of its goods, in the dormitory common areas, and to make sales to students other than the resident of a particular room at the end of those demonstrations. The students contended that they had a right to hold sales demonstrations in their individual dormitory rooms.[18] Two of the students who lived in the dormitories also asserted constitutional privacy rights, and state law rights under the Pennsylvania Landlord and Tenant Act. The district court granted summary judgment for Penn State, rejecting the first amendment claims of both the students and AFS primarily on the basis of AFS I; it also rejected the students' other claims. AFS, 522 F.Supp. 544.
 
 
 14
 In American Future Systems, Inc. v. Pennsylvania State University, 688 F.2d 907 (3d Cir.1982) ("AFS II "), we reversed. We held that Penn State's attempt to prohibit AFS from including certain information in its sales demonstration was prohibited by the first amendment. We explicitly declined to address the question whether Penn State could ban commercial sales activity in the dormitories altogether, but, relying on the test for commercial speech set out by the Supreme Court in Central Hudson Gas & Electric Corp. v. Public Services Commission, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), we held that the university's attempt to censor the presentation was a content-based regulation not based on a substantial government interest.[19] 688 F.2d at 912-13. We also concluded that the district court had failed to consider the students' associational rights and their rights to hear the "commercial speech" in their rooms independent of their rights to conduct the same activity in the common areas. After reviewing the record, we concluded that the university had not introduced any evidence to support its contention that the holding of AFS demonstrations in the students' rooms would interfere with its attempts to preserve a study atmosphere and that the summary judgment was, therefore, inappropriate.[20] We remanded the case to the district court for the factfinding made necessary by our opinion.[21]
 
 
 15
 The district court thereupon held a trial on the constitutionality of Penn State's restrictions on group sales demonstrations in individual rooms. AFS and the students presented expert testimony on the educational and social value of the AFS demonstrations, and student testimony concerning the reasons why particular students attended the demonstrations. Penn State's evidence consisted primarily of the testimony of Dr. Lee Upcraft, Director of Residential Life Programs, who explained a number of asserted justifications for the school's regulations, including that:
 
 
 16
 (a) Such activity could invade the privacy of students;
 
 
 17
 (b) Such activity could disrupt students while studying or sleeping;
 
 
 18
 (c) Such activity could disrupt the educational and personal development programs of the Office of Residential Life Programs;
 
 
 19
 (d) Such activity could disrupt the activities of student government;
 
 
 20
 (e) Such activity could disrupt organized and informal and social and recreational activities of students;
 
 
 21
 (f) Disruptions, to the extent that they occur, would be for a purpose unrelated to the purpose for which residence halls are dedicated;
 
 
 22
 (g) The greater the frequency of the solicitation of money and sales of products and sales of service, the more likely disruptions would occur;
 
 
 23
 (h) Such activity could displace some of the normal activities carried on in a residence hall;
 
 
 24
 (i) Such activity would require Penn State to exercise controls on the commercial activities which could divert resources and efforts from the purpose for which they are now used;
 
 
 25
 (j) Group solicitations and sales are incompatible with the uses to which the residence halls are dedicated; and
 
 
 26
 (k) Group solicitations and sales have the potential for deception, fraud, and overreaching.
 
 
 27
 See AFS, 568 F.Supp. at 671; AFS, 553 F.Supp. at 1280.
 
 
 28
 The district court held that some of the governmental interests advanced by Penn State were not substantial, that the regulation was not reasonably calculated to advance some of the others, and that there was no factual substantiation for the remainder. See AFS, 553 F.Supp. at 1280-81 (preliminary injunction opinion); AFS, 568 F.Supp. at 671. On that basis, the court granted an injunction against the continued enforcement of the regulation.[22] This appeal followed.
 
 
 29
 II. THE APPLICABLE LEVEL OF FIRST AMENDMENT SCRUTINY
 
 
 30
 We are confronted in this case by a regulation that infringes on the right of AFS to disseminate, and of the Penn State students to receive, information directly related to the sale and purchase of AFS merchandise by the students.[23] As a threshold matter, we must determine the nature of this information for first amendment purposes, because there can be no doubt that "the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983); see also Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 562-63, 100 S.Ct. 2343, 2349-50, 65 L.Ed.2d 341 (1980); Ohralik v. Ohio State Bar Association, 436 U.S. 447, 455-56, 98 S.Ct. 1912, 1918-19, 56 L.Ed.2d 444 (1978).[24]
 
 
 31
 AFS and the students argue that, because there are substantial educational, social, and cultural aspects to the AFS demonstrations, these demonstrations are entitled to the first amendment protection afforded "pure" speech, as opposed to the lesser protection applicable to "commercial" speech. In support of this position, two of the students testified about the non-commercial utility of the demonstrations, and two experts testified about their educational value.[25] The district court concluded on the basis of this testimony that "the communicative process at issue here, at least with respect to the students, does not involve solely commercial speech." AFS, 568 F.Supp. at 669.
 
 
 32
 The district court's reliance on the testimony concerning the non-commercial aspects of the demonstrations was misplaced. In Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Supreme Court confronted an argument very similar to that advanced here by AFS and the students. Youngs was engaged in the sale of contraceptive devices, and part of its advertising involved the mailing of pamphlets explaining the usefulness of condoms in avoiding venereal infection. The Court noted that the pamphlets were not "within the core notion of commercial speech" because they did more than simply propose a commercial transaction. Nonetheless, the Court held that, taken together, three factors provided "strong support" for a conclusion that the speech was commercial: (1) the speech involved was conceded to be an advertisement; (2) the speech referred to a specific product; and (3) the speaker had an economic motive for making the speech. The Court explained that mere discussion of important public issues in advertisements does not render them non-commercial. Id. 103 S.Ct. at 2880-81.
 
 
 33
 We believe that this aspect of the case sub judice is controlled by Bolger. As in Bolger, the speech here is essentially an advertisement of AFS's wares, it specifically refers to AFS's products, and AFS's motivation for engaging in the speech is purely economic. There may be cases in which the character of the speech is unclear and in which testimony concerning the motivation of the listeners and the educational or social value of the speech might be relevant in determining whether the speech is commercial or pure for first amendment purposes.[26] However, cases of this type will be rare, and this is not one of them. On the record before us, the speech in question is commercial as a matter of law.
 
 
 34
 Moreover, we do not believe, as the district court apparently did, that the speech at issue can be commercial for purposes of determining AFS's rights but pure for purposes of determining the students' rights. The Bolger criteria are employed to discern whether speech is, in its essence, part and parcel of a proposed commercial transaction. It is this connection to a commercial transaction that justifies the government's greater role in regulating the speech: such speech is more subject to abuse and less likely to be chilled by regulation than other types of communication. See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 1830 n. 24, 48 L.Ed.2d 346 (1976). Although, as we noted above, the motivation of the listeners may occasionally be relevant to a conclusion about whether the speech is commercial, the essential nature of the speech remains unchanged regardless of whose rights are being adjudicated, and the same test should be used whether it is the speaker's or the listeners' rights that are at stake. Thus, for the students as well as AFS, the speech here was undoubtedly commercial.
 
 
 35
 This conclusion, however, forces us to confront an unusual situation: the intersection between government regulation of commercial speech and the regulation of speech on government-owned property. Although the Supreme Court has set up a detailed analytic framework for determining the constitutionality of regulations in each of these situations, it has not, to our knowledge, been faced with the question of what test should be employed when both factors are present. If the two modes of analysis were equally applicable to the facts of this case, we would have to determine whether they yielded different results, and, if so, we would have to choose between them in determining the validity of Penn State's regulation.
 
 
 36
 The analysis developed by the Supreme Court for speech on government property and the one for commercial speech are not, however, equally applicable to this case. In order to determine which of two "government property" tests to employ, we would have to decide whether student dormitory rooms are "public" or "non-public" forums. See infra pp. 863 - 64. For the reasons detailed below, see infra p. 864, we believe that dormitory rooms do not fit neatly into either the public forum or the non-public forum mold. As a result, neither analytic framework set out by the Court for speech on government property is completely appropriate here. Our best course of action, therefore, is to pursue the mode of analysis developed by the Supreme Court for cases involving commercial speech; we believe that this analysis is flexible enough to permit a thorough and proper weighing of all the factors and interests involved in this case.
 
 
 37
 In Central Hudson Gas & Electric Co. v. Public Service Commission of New York, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court set out a four-part test for assessing the validity of restrictions on commercial speech. In accordance with this test, we must first determine whether the speech at issue concerns lawful activity and is not misleading; speech failing this initial part of the test is not entitled to any first amendment protection. Second, we must examine the government's asserted interests in regulating the speech, and we may uphold the regulation only if it is based on a substantial government interest. Third, we must ascertain whether the regulation directly advances the asserted governmental interest. Finally, we must be convinced that the regulation is no more extensive than necessary to carry out the government's objective. Id. at 566, 100 S.Ct. at 2351; see also Bolger, 103 S.Ct. at 2881; AFS II, 688 F.2d at 913. We turn to application of the Central Hudson test.
 
 III. APPLYING THE CENTRAL HUDSON TEST
 
 38
 The AFS product demonstrations easily get over the hurdle posed by the first prong of the Central Hudson test. The demonstrations clearly concern lawful activity, and the university does not contend that they are misleading.[27] The demonstrations are thus entitled to the first amendment protection afforded commercial speech.
 
 
 39
 The second step in the Central Hudson analysis is an evaluation of the governmental interests being offered to justify the restrictive regulation. Here, Penn State's long list of proffered justifications for banning group demonstrations in the students' dormitory rooms, see supra p. 861, can be distilled into two major asserted interests. First, Penn State contends that, in its role as property owner, it may preserve its dormitories for their intended use and prevent them from becoming rent-free merchandise marts; second, the school asserts that, as educator, it may ensure that the dormitories maintain their residential and study-oriented atmosphere.
 
 
 40
 It has long been recognized that the government has a significant interest in dedicating its own property to a particular use. This interest, however, is not without limitation. Some parcels of government property, such as parks and streets, are effectively held in trust for the public "for purposes of assembly, communicating thoughts ..., and discussing public questions." Carey v. Brown, 447 U.S. 455, 460, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980) (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.)). This kind of property is considered a "public forum," and the ability of the government to restrict speech on public forums is extremely circumscribed. Specifically, the government may adopt time, place, and manner restrictions in public forums only if they are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. See Clark v. Community for Creative Non-Violence, ---- U.S. ----, ----, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); Members of the City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984); United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); Heffron v. International Society for Krishna Consciousness, 452 U.S. 640, 647-48, 101 S.Ct. 2559, 2563-64, 69 L.Ed.2d 298 (1981). Other property is dedicated by the government to a purpose inconsistent with public use as a forum for speech; in such "non-public forum" cases, the government may regulate speech so long as its regulation is reasonable and viewpoint neutral. See Perry Education Association v. Perry Local Education Association, 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (policy giving representative union but not rival union access to teachers' school mailboxes held constitutional); United States Postal Service v. Council of Greenburgh Civic Associations, 453 U.S. 114, 129-30, 132-33, 101 S.Ct. 2676, 2685, 2686-87, 69 L.Ed.2d 517 (1981); Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976).
 
 
 41
 If university dormitories were a public forum, Penn State's first justification for prohibiting the AFS demonstrations--that such action is necessary to preserve the property for its dedicated use--would clearly be insubstantial. Obviously, the state cannot prohibit speech on its property on the grounds that the prohibition is necessary to preserve the property for its intended use when one important purpose of the property is to provide a forum for members of society to communicate information and ideas. On the other hand, if the property involved were a typical non-public forum, such as a federal office building, the government's asserted interest in maintaining that property for its intended use would indeed be great.
 
 
 42
 This case is unusual, however, because university dormitories have characteristics of both public and non-public forums. With respect to outsiders, the students' dormitory rooms at Penn State appear to be non-public forums: they are certainly not in existence in order to facilitate general public communication. The university, therefore, has a legitimate proprietary interest in maintaining the dormitories for their intended use as residence halls and not as rent-free space for commercial vendors. For the students, however, not only do the dormitories resemble public forums but the university campus resembles society at large. Most students at a large public university like Penn State spend most of their time immersed in a world dedicated to the purpose of their education. They live in a dormitory, travel to and from classes on campus, listen to the college radio station, and read college newspapers. The government owns all of the property related to the students' world yet the students must be able to exchange ideas and information, including commercial information, somewhere on this property unencumbered by university restrictions;[28] hence, their interest in doing so in their own rooms is enhanced. As in the case of public parks, therefore, one important use of dormitory rooms is as a forum for speech uninhibited by governmental interference--at least when such speech is desired by the students. For this reason, Penn State cannot meet the Central Hudson requirement of a substantial governmental interest merely by making the blanket assertion that it needs to restrict speech in the dormitories in order to preserve them for their intended use.[29]
 
 
 43
 Penn State, however, is more than a mere property owner; it is an educational institution. The university contends that, as educator, it must be able to maintain a residential and study-conducive atmosphere in the dormitories. There can be no doubt that a public university has a significant interest in carrying out its educational mission, and that this interest necessarily gives it some power to regulate its students' lives. While this interest, standing alone, might not be sufficient to meet the Central Hudson test, we believe that Penn State's proprietary interest (with respect to AFS and other outsiders) in ensuring that its premises do not become a rent-free merchandise mart, coupled with its educational interest (with respect to the students), constitute together a substantial justification for its attempt to regulate commercial speech in the students' dormitory rooms.
 
 
 44
 In accordance with Central Hudson, we must next determine whether the regulation at issue advances the government's asserted interest. Penn State wants to ensure that its dormitories remain a residential and study area for its 12,000 on-campus students. A population of 12,000 is a very tempting market for the sellers of innumerable products and services. Because relatively few college students have an automobile on campus, the ability of a seller to transact business on campus is an important factor in making sales. Furthermore, since the students generally live in close proximity to one another, there may be efficiencies or economies of scale in collectively soliciting them where they reside. When the fact that dormitories present potential vendors with a place to sell their goods rent free is added to these other considerations, it is not unreasonable to conclude that the character of the Penn State dormitories would be adversely affected in the absence of restrictions on commercial solicitation.[30] The university's restriction, therefore, directly advances its purpose.
 
 
 45
 Finally, we may uphold the regulation only if it is not excessive in light of the state's objective. This does not mean, of course, that if lesser restrictions on AFS alone would be sufficient to maintain the atmosphere in the dormitories, the university's regulations must fail. Rather, we must be convinced only that Penn State's total ban on group demonstrations in the dormitory rooms is necessary given the effect of allowing all commercial vendors access to the students' rooms on the same terms. See Clark v. Community for Creative Non-Violence, 104 S.Ct. at 3071; Heffron, 452 U.S. at 651-55, 101 S.Ct. at 2566-67.
 
 
 46
 In light of recent Supreme Court precedent, we believe that this last prong of the Central Hudson test cannot be read as a "least restrictive means" requirement. In Clark v. Community for Creative Non-Violence, --- U.S. ----, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the Court was faced with a National Park Service regulation that prohibited sleeping in certain parks in Washington, D.C. The Court of Appeals for the District of Columbia Circuit had held the regulation invalid because of its belief that the regulation could have been more narrowly tailored to meet the agency's purpose, which is a requirement under the "public forum" test. See supra p. 864. The Supreme Court reversed the Court of Appeals on this issue, stating:
 
 
 47
 We are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the government interest in preserving park lands.... The Court of Appeals' suggestion that the Park Service minimize the possible injury by reducing the size, duration, or frequency of demonstrations would still curtail the total allowable expression in which demonstrators could engage ... and these suggestions represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. We do not believe that [prior first amendment cases] assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise ....
 
 
 48
 Id. 104 S.Ct. at 3072; see also Regan v. Time, Inc., 104 S.Ct. at 3271-72 (plurality opinion of White, J.) ("The less-restrictive-alternative analysis invoked by [respondent] has never been a part of the inquiry into the validity of a time, place, and manner regulation."); White House Vigil for the ERA Committee v. Clark, 746 F.2d 1518, at 1528-1532 (D.C.Cir.1984) (discussing Supreme Court's "rejection of the notion that courts may arbitrarily substitute their judgment for that of legislative or administrative institutions" in first amendment cases).
 
 
 49
 Although the Supreme Court has not yet addressed this issue in the context of the Central Hudson test, we see no reason for doubting that it would interpret the "no more extensive than necessary" language of Central Hudson in the same way it has interpreted the "narrowly tailored to serve a significant governmental interest" language in Community for Creative Non-Violence. Therefore, although we might be able to imagine alternative regulations that accomplish Penn State's objectives while interfering less with the students' and AFS's rights to communicate, we will not strike down the university's regulation on this ground. This court may not establish itself as the manager of Penn State's students and property, nor may it substitute its own judgment for Penn State's conclusion as to the best means to carry out the university's legitimate ends. There is a whole realm of permissible means of accomplishing the university's objectives, and our function must be limited to determining whether the school has chosen an acceptable--not the least restrictive--alternative.
 
 
 50
 Penn State's regulation does not prohibit all commercial information from reaching its students while they are in their dormitory rooms. If invited by a student, a commercial vendor may conduct a one-on-one demonstration and sale in that student's own room. Moreover, the telephone, mails, student newspaper, and college radio station are all available to commercial entities who desire to advertise in the student market. In addition, the university's regulation does not prohibit all group solicitation on state-owned property; Penn State has indicated its willingness to make a facility on campus, the Nittany Lion Inn, available to AFS and other vendors for group sales demonstrations.
 
 
 51
 We believe that the existence of ample alternative means for students and vendors to exchange commercial information in the dormitories and elsewhere confirms that Penn State's restriction is carefully tailored to carry out its intended purpose. The university does not want its dormitory rooms converted, in effect, into rent-free space for commercial vendors because it fears that such a result would prevent it from maintaining the dormitories as a place where students can reside and study without disruption. It has acted on this fear by banning all on-site group commercial solicitation on an equal basis, while permitting all other types of commercial communication between its students and outside vendors. We cannot say that this limited restriction on commercial speech is excessive.
 
 IV. CONCLUSION
 In sum, we hold as follows:
 
 52
 (1) the group demonstrations that AFS desires to conduct constitute commercial speech for first amendment analysis with respect to the rights of both AFS and the students;
 
 
 53
 (2) the demonstrations are not unlawful or misleading, and they are therefore entitled to first amendment protection;
 
 
 54
 (3) Penn State's regulation banning group commercial solicitation in its students' dormitory rooms is constitutional because it directly advances the university's substantial (governmental) interests, as property owner and educator, in maintaining its dormitories as a residential and study area for its students and in preventing their use as a rent-free merchandise mart, and because the regulation is not excessive in light of this objective;
 
 
 55
 (4) the privacy claims asserted by the students are barred by res judicata.[31]
 
 
 56
 The judgment of the district court will be reversed and the case will be remanded with instructions to enter judgment on the merits for Penn State.[32]
 
 
 57
 ADAMS, Circuit Judge, concurring.
 
 
 58
 Reasonable persons undoubtedly will differ over the appropriate scope of the right of freedom of expression enshrined in the Constitution; indeed, one of the First Amendment's special strengths is that it ensures that the question of its ambit is itself a proper subject of free and vigorous debate. Spirited exchanges are likely to arise over virtually any First Amendment issue, and to a considerable extent the very existence of those exchanges demonstrates the vitality and value of the Amendment's guarantees. The fact that this case, involving a corporation's right to hawk housewares in a college dormitory, has elicited, to date, seven judicial decisions, is in some respects a testament to the importance and complexity of the concept of freedom of expression.
 
 
 59
 But no matter how critical the First Amendment and its doctrinal evolutions may be, it is necessary that we not lose sight of precisely what is at stake in the matter at hand. We are asked to extend the Amendment's protection to a commercial vendor who seeks free access to state university property in order to sell china and kitchenware to students. It is my view that from whatever perspective one approaches this case, the First Amendment cannot be held to bar the challenged state regulation. Accordingly, I concur with the majority's result and reasoning, and write separately mainly to note that several independent lines of analysis provide equally strong support for the result reached today.
 
 
 60
 First, I agree that the speech at issue is commercial as a matter of law. The commercial speech doctrine, which offers lesser protection for commercial than for non-commercial communications, has been criticized almost since its inception for its failure to develop a hard and fast definition for this type of speech. See Baker, Commercial Speech: A Problem in the Theory of Freedom, 62 Iowa L.Rev. 1, 42-43 n. 146 (1976); Cox, Foreword: Freedom of Expression in the Burger Court, 94 Harv.L.Rev. 1, 26-39 (1980). The drawbacks created by this definitional difficulty are manifest--commercial speech, if too broadly defined, may well extend to encompass speech that also carries political or self-expressive import, and the distinction may then serve to diminish important First Amendment protections. The present case makes evident, however, that similar dangers inhere in not distinguishing between commercial and non-commercial speech. To suggest that there is an absolute First Amendment right to sell kitchenware in state university dormitories is in my judgment to denigrate competing rights of the university and its students, and to invite dilution of the amendment by its tortuous application to the current controversy. See Ohralik v. Ohio State Bar, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978) ("To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech.") While the line between commercial and non-commercial speech may be difficult to draw in borderline cases, as I see it kitchenware sales do not require us to approach that borderline. See majority opinion at 861 - 62; see Ad World, Inc. v. Township of Doylestown, 672 F.2d 1136, 1139-40 (3d Cir.) cert. denied, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 850 (1982) ("The important question is whether the publication as a whole relates solely to the economic interest of the speaker and its audience.") The communication at issue here is clearly speech proposing a commercial transaction, and nothing more. See Ohralik, 436 U.S. at 455-56, 98 S.Ct. at 1918-19.
 
 
 61
 Once it is determined that commercial speech is involved, one of several lines of analysis may be pursued to determine the validity of the regulation. The majority applies the Central Hudson test.[1] An equally plausible approach would be to treat Penn State's regulation as a reasonable time, place, and manner restriction. The University has a policy not to open its dormitories to general commercial solicitations. The specific restriction at issue here is the University's prohibition of a certain manner of commercial speech--group sales--in a specific place--individual student dorm rooms. The University does not seek to prohibit commercial speech altogether; in fact, it allows one-on-one sales in dorm rooms, direct solicitation of sales by telephone and mail, advertising in the student media, and group sales demonstrations at the Nittany Lion Inn, an attractive motel located on the campus.
 
 
 62
 Time, place, and manner restrictions are valid "provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a governmental interest, and that they leave open ample alternative channels for communication of the information." Clark v. Community for Creative Non-Violence, --- U.S. ----, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (see also cases cited therein). The limitation here meets all three criteria.
 
 
 63
 The first element--that the restriction be content-neutral--must be read to mean content-neutral within the category of commercial speech. That is, a court must first determine whether the limitation covers commercial or non-commercial speech, and then ascertain whether, within either category, the limitation is content-neutral. This reading is required by the Supreme Court's language in Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 781, 96 S.Ct. 1817, 1835, 48 L.Ed.2d 346 (1976), where the Court expressly noted the possibility of "time, place, and manner restrictions on commercial speech."[2] In Virginia State Board, the Court held that the statute at issue did not meet time, place, and manner requirements, because it singled out speech of a particular content--the prices of prescription drugs--and left open no alternative channels to communicate such information to prospective customers. 425 U.S. at 771, 96 S.Ct. at 1830. Similarly, if the University denied access to AFS while allowing Tupperware parties, or if it distinguished between, for example, cookware and jewelry sales, the regulation could not be construed as a content-neutral time, place, and manner restriction. Here, however, the regulation forbids all commercial speech in the form of group sales in dormitory rooms.
 
 
 64
 The second and third requirements of the time, place, and manner rule are also met. As the majority notes, the University has a substantial interest in not allowing its dormitories to become "rent-free merchandise marts," and a multitude of alternative channels are made available to AFS to communicate information to the students regarding its products. Consequently, the University's restriction on commercial speech in its dormitories is valid as a reasonable time, place and manner restriction. See Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (anti-noise statute restricting speech near schoolgrounds held constitutional); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (upheld prohibition on picketing near a courthouse); Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951) (upheld restrictions on door-to-door magazine solicitations).[3]
 
 
 65
 An analysis of the University's regulation must also, I believe, consider the issue "in light of the special characteristics of the school environment." Tinker v. Des Moines Independent School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). The school cases provide both an independent basis for the result reached by the majority, as well as an underlying consideration crucial to the other lines of analysis. In the ordinary setting, the court must weigh the interest of the state against the individual's interest in free speech. The university setting requires consideration of a third factor--the institutional autonomy of an academic body.
 
 
 66
 The Supreme Court has often emphasized the danger of judicial intervention in scholastic affairs. Widmar v. Vincent, 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440; id. at 279 n. 2, 102 S.Ct. at 279 n. 2 (Stevens, J., concurring); University of California Regents v. Bakke, 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (opinion of Powell, J.) ("Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment"); Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Epperson v. Arkansas, 393 U.S. 97, 104-05, 89 S.Ct. 266, 270-71, 21 L.Ed.2d 228 (1968). While the Court did intervene in each of these cases, it was careful to admonish that intervention was justified only "where essential to safeguard the fundamental values of freedom of speech and inquiry and belief." Epperson, 393 U.S. at 104-05, 89 S.Ct. at 270-71, citing Developments in the Law-Academic Freedom, 81 Harv.L.Rev. 1045, 1051-55 (1968); see also id. at 1150-1152 (discussing institutional autonomy and judicial review).
 
 
 67
 Thus, the Supreme Court has interposed itself in academic affairs when a state legislature sought to control curricula by flatly forbidding the teaching of evolution, Epperson, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228; where school officials sought to suppress symbolic expression protesting United States involvement in Vietnam, Tinker, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; and where a state university refused to recognize certain student groups on the basis of their religious or political beliefs. Widmar, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440; Healy, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266. The question we face today is whether the sale of kitchenware may implicate sufficiently fundamental First Amendment concerns to justify a court's intrusion in the affairs of Penn State University. I believe that there are indeed "commonsense differences" between speech about the theory of evolution, religious commitment, and political dissent, on the one hand, and kitchenware sales on the other. See Virginia State Board, 425 U.S. at 771 n. 24, 96 S.Ct. at 1830 n. 24. To extend the arm of the federal courts to protect the latter would be to demean the importance of the former, and to ignore the institutional autonomy of the University. Our Court has refused to intervene in academic affairs in far closer cases of speech regulation than the sale of kitchenware in dormitory rooms. See, e.g., Seyfried v. Walton, 668 F.2d 214 (3d Cir.1981) (court did not disturb order of high school superintendent forbidding the dramatic production of "Pippin").
 
 
 68
 The public school context leads to a fourth line of analysis supporting the University's regulation. When confronting the issue of a speaker's access to public property, the court must look to the nature of the forum. Where the state has created a public forum for open expressive activity, Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (university meeting facilities open to all student groups except religious groups), or where the forum is one traditionally devoted to public communication, Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (parks or streets), any content-based exclusion must be narrowly tailored to achieve a compelling state interest. Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). All public property, however, is not a public forum. Where public property is "not by tradition or by designation a forum for public communication," the state is allowed to "reserve the forum for its intended purpose, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry Education Assn v. Perry Local Educators' Assn, 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).
 
 
 69
 The medium at issue in Perry Education Assn was a public school's internal mail facilities. The Supreme Court upheld the school's refusal to allow a rival union access to the mail system, even though the school provided access to the union that represented its teachers and to several civic organizations. The Court relied on the fact that the mail system was not "open for use by the general public." 103 S.Ct. at 956. Similarly, here, the university dormitories are not open to the general public. See Majority Opinion, at n. 8. As the Court in Widmar noted:
 
 
 70
 A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and non-students alike, or that a university must grant free access to all of its grounds or buildings.
 
 
 71
 454 U.S. at 267-68 n. 5, 102 S.Ct. at 273 n. 5.
 
 
 72
 Moreover, there is no contention here, as there was in Perry Education Assn, that the University has selectively sought to restrict one speaker because of its particular viewpoint. See Perry Education Assn, 103 S.Ct. at 957. There is nothing in the record suggesting that the University attempted to suppress the sale of kitchenware on ideological grounds; indeed, it is virtually inconceivable that it would. As such, a pertinent question to be addressed is whether the restriction is "reasonable in light of the purpose which the forum at issue serves." Perry Education Assn, 103 S.Ct. at 957. Surely, it is not unreasonable to restrict the access of commercial vendors to a student dormitory; such a restriction takes into account both the interest of the university in minimizing disruption of students' studying and privacy, and the University's interest in not transforming its dormitories into commercial emporiums.
 
 
 73
 The fact that the regulation at issue here can be supported on a variety of independent grounds might be said to suggest confusion in the law of the First Amendment. I draw quite the opposite conclusion. The diversity of First Amendment analyses has developed precisely as a result of the Amendment's scope and importance. The Amendment is broadly phrased because the potential for violations of a speaker's or listener's rights to expression and information are manifold; the various doctrines that have evolved demonstrate an effort to apply the amendment in a wide range of contexts, implicating innumerable competing interests and interlocking issues. That each of these analyses intersects to support the result here only underscores the point made at the beginning of this concurrence.
 
 
 74
 With all due respect, I do not believe that the First Amendment's protection of a free and robust marketplace of ideas requires that a university dormitory be turned into a marketplace for a private corporation's sale of kitchenware.[4]
 
 SAROKIN, District Judge, concurring:
 
 75
 I have one disagreement with the majority's excellent opinion, with which I join. However, I write separately because, in my view, this case could be and should be decided on much narrower grounds. Commercial speech is entitled to first amendment protection only if it is neither misleading nor related to unlawful activity. Appellee's activities do not meet this test.
 
 
 76
 The majority states that "AFS product demonstrations easily get over the hurdle posed by the first prong of the Central Hudson test. The demonstrations clearly concern lawful activity, and the university does not contend that they are misleading." Majority op. at 863-. I respectfully disagree with both of these conclusions. First, the university, in fact, asserts its interest in regulating AFS product demonstrations because "[g]roup solicitations and sales have the potential for deception, fraud and overreaching." Majority op. at 13, 20 n. 27. Moreover, in its initial brief, the university stated
 
 
 77
 There is no question that Penn State is concerend with the deceptive sales tactics of AFS. The record establishes that AFS provides a written "script" for its sales representatives, and that the script was deceptive and misleading in three respects. First, it misrepresented the nature of the two-year "peace of mind" guarantee by failing to disclose that a purchaser could not exchange merchandise if it was used even once. Second, it misrepresented the AFS credit policy by failing to disclose that the policy differed for blacks and Hispanics. Third, the script failed to provide for oral notification to the purchaser at the time of consummation of the sale of the right to cancel within three days, as required by federal and state law.
 
 
 78
 Appellant's Brief at 44 (citations omitted). At that time, the university argued that such representations, among other factors discussed in the majority opinion, rendered its regulation reasonable. After oral argument, and in a Supplemental Brief requested by the court, the university refined its position:
 
 
 79
 Penn State, both in AFS I and the present case, introduced evidence showing that AFS credit policies were discriminatory and that certain AFS sales techniques were deceptive and misleading. The purpose of such evidence, however, was to demonstrate that such speech is not in the first instance proctected by the First Amendment, the initial element of any First Amendment analysis.
 
 
 80
 Appellant's Supplemental Brief at 28 (emphasis added). The question was thus squarely presented for review by this court.
 
 
 81
 At trial, ample evidence was presented of the fraudulent practices documented by the university. Thus, the failure fully to disclose either AFS's exchange policy, see App. 1136 (Defendant's Exhibits D-22.1-22.3), or a buyer's right to cancel the contract within three days, see App. 1140-41 (Defendant's Exhibit D-40), are fully borne out by the evidence.[1] Furthermore, as the majority recognizes, AFS's offer of a free vacation for its on-campus host or hostess is itself deceptive. Majority op. at 4 n. 5. More important, this court has recently concluded that AFS's policies "discriminated on prohibited bases such as race, sex and marital status which were not related to the social need those [policies] sought to address," United States v. American Future Systems, Inc., 743 F.2d 169, 182 (3d Cir.1984), in violation of the Equal Credit Opportunity Act, 15 U.S.C. Sec. 1691 et seq., The court wrote:
 
 
 82
 Despite all of the disadvantages that women have had, historically and at present, the significant disadvantages suffered by white women have been far less than those disadvantages black women, Native American women (Indians), Hispanic and other minority American women have had to endure for centuries. Yet the paradox of AFS's plan is that it perpetuates the past disparities between white and minority women and rather than helping all women it aids only white women and slams the door of equal credit opportunity in the faces of minority women.
 
 
 83
 743 F.2d at 181.
 
 
 84
 Taken together, these facts paint a picture of appellee AFS seeking first amendment protection for fraudulent or misleading speech, in the pursuit of policies which are discriminatory on the basis of race and sex.[2] The Supreme Court had, as the majority states, made clear that such speech, which is either unlawful, misleading or both is not entitled to first amendment protection. Majority op. at 19, citing Central Hudson, 447 U.S. at 566, 100 S.Ct. at 2351. See also Bolger, 103 S.Ct. at 2881; Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976). Of course, protecting the public from being misled, a goal which, the district court found motivated the university, may justify state regulation infringing speech.[3] Moreover, the illegality of AFS's credit policies as found by this court just a few months ago, ought alone bar AFS from seeking to clothe such activities in first amendment protective garb. See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 496, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982); Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973) (first amendment does not protect advertisements deemed discriminatory). As the Supreme Court has stated, with respect to advertising, only "[t]ruthful advertising related to lawful activities is entitled to the protections of the First Amendment." In re R.M.J., 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982).
 
 
 85
 Therefore, although I can find no fault with the reasoning or principles enunciated in the majority opinion, it begins the analysis where it could have ended it. Before AFS can mount a constitutional attack upon the regulation imposed by Penn State, it must establish its entitlement to do so. By decision of this very court, however, AFS is engaged in activities which unlawfully discriminate; the record below demonstrates a pattern of fraud and misrepresentation as well. Under such circumstances, AFS is not entitled to the learned analyses that it here receives at the hands of this court, but rather a rejection of its claim because its conduct does not entitle it to first amendment protection. In the commercial arena, no company or person has a constitutional right to speak words which are intentionally misleading, particularly when such speech furthers a commercial venture which discriminates on the basis of race and sex.
 
 
 
 *
 Honorable H. Lee Sarokin, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 See American Future Sys., Inc. v. Pennsylvania State Univ., 618 F.2d 252 (3d Cir.1980) ("AFS I "); and American Future Sys., Inc. v. Pennsylvania State Univ., 688 F.2d 907 (3d Cir.1982) ("AFS II "). The district court has also authored several opinions in the case, which, after the initial reference, we refer to by their volume of the Federal Supplement, preceded by the legend "AFS."
 
 
 [2]
 As explained below, this case was originally brought by AFS alone; the students were joined after this court affirmed the district court's holding that AFS could not assert the constitutional rights of its potential customers. See American Future Sys., Inc. v. Pennsylvania State Univ., 464 F.Supp. 1252, 1259 (M.D.Pa.1979), aff'd, 618 F.2d 252 (3d Cir.1980) (AFS I ). The student-plaintiffs named in the amended complaint are Steven Brubaker, Richard J. Wingert, W. Bruce Del Valle, Joan D. Varsies, Dennis C. Habacher, and John B. Spillar. Kevin Graves was added as a plaintiff in August 1981; Kathy Johnson was added in December 1982; and John B. Spillar was dropped as a plaintiff at the same time. Only Graves is currently a student at Penn State
 
 
 [3]
 AFS's sales techniques are described in detail in United States v. American Future Systems, Inc., 571 F.Supp. 551, 554-57 (E.D.Pa.1983), aff'd, 743 F.2d 169 (3d Cir.1984)
 
 
 [4]
 The original contact is made either by AFS's central booking office in Bryn Mawr, Pennsylvania, or by the sales representative responsible for the area in which a particular college is located
 
 
 [5]
 The "free vacation" does not include food or transportation, but only accommodations. American Future Sys. Inc. v. Pennsylvania State Univ., 553 F.Supp. 1268, 1273 (M.D.Pa.1983) (finding of fact No. 55). There are evidently other limitations on the offer as well. It may not be used unless the recipient is 21 years of age or older and may only be used within a prescribed time period. The effect of these two limitations is that many students do not use the "free" vacation at all. See AFS, 464 F.Supp. at 1256 (finding of fact No. 35). AFS generally does not inform the potential hostess of these limitations. See AFS, 553 F.Supp. at 1274 (finding of fact No. 77); AFS, 464 F.Supp. at 1256 (findings of fact Nos. 27, 35). But see AFS, 464 F.Supp. at 1256 (finding of fact No. 26)
 
 
 [6]
 This number does not include women who have attended AFS demonstrations before. AFS, 553 F.Supp. at 1273 (finding of fact No. 58)
 
 
 [7]
 This Florida trip is subject to the same limitations as that offered to the hostess. Only women who have not previously attended an AFS demonstration are counted toward the ten required for the offering of a door prize. See supra notes 5 & 6
 
 
 [8]
 The demonstrations are extensively scripted and accompanied by visual aids. The students are offered a glamorous view of their post-college apartment life, and are urged to buy "quality" tableware, crystal, and cookware without delay
 
 
 [9]
 AFS has been found to follow a racially discriminatory credit policy, under which white students receive better terms than blacks or hispanics. See United States v. American Future Systems, Inc., 571 F.Supp. 551 (1983), aff'd, 743 F.2d 169 (3d Cir.1984)
 
 
 [10]
 The University had "No Trespassing" signs posted near the entrance of each dormitory, and it required students to sign a housing contract that prohibited "any business enterprise for personal profit ... in or around the university operated units." AFS, 464 F.Supp. 1254-55. In addition, the student handbook states:
 The institution ... has rights and responsibilities of its own. The rights and responsibilities of the institution include: ... [the] [r]ight to prohibit individuals and groups who are not members of the University community from using its physical and operating facilities for commercial ... activities.
 ....
 Lectures, concerts, demonstrations, displays, or exhibits may not be used in any manner as a means of promoting commercial companies, products, or services.
 ....
 The word "commercial" ... means any activity or event which results in personal financial gain to the peddler or organization thereof, provided that contact between a peddler and a student shall not be deemed commercial if such contact was invited by the individual student involved.
 ....
 Persons who are not students or employees of the University, while on University property, are required to ... abide by University policies and regulations.
 AFS I, 618 F.2d at 253 (citations omitted).
 
 
 [11]
 AFS scheduled 51 demonstrations in the Penn State dormitories during the last two weeks of September 1977. AFS, 553 F.Supp. at 1274 (finding of fact No. 79)
 
 
 [12]
 AFS, 553 F.Supp. at 1272 (finding of fact Nos. 44, 45)
 
 
 [13]
 American Future Sys., Inc. v. Pennsylvania State Univ., 568 F.Supp. 666, 670 (M.D.Pa.1983)
 
 
 [14]
 The court did not base its conclusion wholly on AFS's lack of standing, in the constitutional sense, to raise those issues, but on a number of factors, including that "facts in support of such a claim [i.e., one based on the student's rights] have not been pled or proven," and "assertion of the First Amendment rights of Penn State students by [AFS] would add nothing to the analysis of this case." AFS, 464 F.Supp. at 1259
 
 
 [15]
 The district court, in this first trial, used an advisory jury, which made certain factual determinations. We will not distinguish between the findings made by the judge and those made by the jury, since we are not reviewing those findings here
 
 
 [16]
 The court based this distinction on Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)
 
 
 [17]
 The information in this paragraph is taken from AFS I, 688 F.2d at 910-11
 
 
 [18]
 The students also asserted freedom of association rights which the district court found to be "indistinguishable from the rights sought with respect to making group demonstrations and sales in their dormitory rooms." AFS, 522 F.Supp. at 552; AFS, 510 F.Supp. at 987
 
 
 [19]
 For a description of the Central Hudson test, see infra pp. 863 - 64
 
 
 [20]
 We affirmed the district court's rejection of the students' privacy claims. 688 F.2d at 915-16
 
 
 [21]
 Penn State reacted to the first part of our holding in AFS II by promulgating a new regulation that no longer permitted use of the common areas of dormitories for commercial demonstrations. Thus, Penn State now prohibits AFS from conducting any kind of demonstration in any part of the dormitories. However, the comprehensive ban on the use of the common areas is not presently before us
 
 
 [22]
 The court held that only those plaintiffs currently residing in the Penn State dormitories who desired to host AFS demonstrations had standing to raise the issue of the constitutionality of the regulations
 
 
 [23]
 The students also assert that their rights to "free association" are infringed by the regulation in question here, and that this infringement is independent of the infringement on speech. The district court rejected this argument. AFS, 522 F.Supp. at 552; AFS, 510 F.Supp. at 987. In AFS II, we implicitly treated the "speech" and "associational" interests as intertwined. 688 F.2d at 914-15. We now expressly hold that the students have not raised any "free association" claims independent of their "free speech" claims
 The basis of the students' argument that they have separate "association" claims is that the dormitory regulations permit one-on-one sales in the dormitory rooms, but prohibits group sales demonstrations therein. Our conclusion in this case is that Penn State has a substantial proprietary and educational interest in regulating commercial speech in its dormitories in order to preserve their residential character and use, that the prohibition on group sales demonstration directly furthers that interest, and that Penn State's regulation is not excessive. See infra pp. 863 - 67. The exception for one-on-one sales is not inconsistent with the interest Penn State seeks to further; permitting individual sales does not involve the risk that commercial organizations will have an incentive to turn the dormitory into a "rent-free merchandise mart" because it does not provide them with the enhanced ability to reach the student market provided by group demonstrations. See infra pp. 865 - 66. The infringement on the students' associational rights in this case is limited--there is no evidence that students are prohibited from inviting an AFS representative to a party as a social guest, as long as no commercial activity takes place--and the infringement is directly related to the legitimate purpose Penn State is seeking to further by means of its regulation. We are aware of no authority for the proposition that where the state would have the power to regulate speech if it were made in a vacuum, the presence of a group of listeners, whose very presence gives rise to the state interest that justifies the regulation, gives the speech additional protection under the right of "free association."
 
 
 [24]
 Of course, the first amendment would not even be implicated if Penn State were not a "state actor" for purposes of the first amendment. Penn State has raised this issue, in light of three recent Supreme Court decisions, which have redefined the boundaries of the "state action" doctrine. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). We have recently considered similar claims by Temple University and the University of Pittsburgh and concluded that those institutions are "state actors" on the basis of their close relationship with the state government. Krynicky v. University of Pittsburgh, 742 F.2d 94 (3d Cir.1984) (consolidated with Schier v. Temple University ). Since Penn State has a far closer relationship with the state than the University of Pittsburgh or Temple University, we believe that our analysis in Krynicky clearly establishes that Penn State is a state actor
 
 
 [25]
 The students and experts explained that the AFS presentations were valuable to the students because they taught the students about fine china and about consumer credit purchasing, furnished the students with a worthwhile experience in relating to people, and generally provided a valuable real-life experience to students whose daily routine was otherwise very academic
 
 
 [26]
 For instance, if a non-commercial organization, such as the Campus Crusade for Christ, were to sell bibles or religious materials at meetings, the sales would not necessarily make the communication during the meeting commercial speech for first amendment purposes. The critical question would be whether the primary purpose of the organization was to sponsor religious activity or to sell Bibles, and the Bolger criteria would be applied in an attempt to answer this question. In such a case, testimony regarding the motivation of the speakers, as well as regarding the motivation of the listeners and the value of the speech, would no doubt be relevant to the Bolger analysis
 
 
 [27]
 Penn State does make the blanket assertion that group sales "have the potential for deception, fraud, and overreaching." Supra p. 860 (emphasis added). However, the university does not claim that AFS's demonstrations are, in fact, misleading, nor did it present any evidence to this effect in the district court
 
 
 [28]
 Indeed, the Supreme Court has determined that meeting facilities on a university campus are public forums. Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). See also Stanley v. McGrath, 719 F.2d 279 (8th Cir.1983) ("A public university may not constitutionally take adverse action against a student newspaper ... because it disapproves of the content of the paper.")
 
 
 [29]
 A useful analogy might be made here to public housing projects. It is unclear whether a public housing authority could prohibit tenants in public housing projects from inviting companies such as AFS to conduct group demonstrations in their individual apartments solely on the grounds that, as property owner, the government has a substantial interest in maintaining the apartments for residential use
 
 
 [30]
 We are not persuaded by the argument that what takes place in individual students rooms' does not impair the general atmosphere in the dormitories. AFS itself scheduled 51 demonstrations in the Penn State dormitories during two weeks in September 1977. See supra note 11. Each of these proposed demonstrations was supposed to involve a minimum of ten to fifteen students. See supra p. 856. Even if the demonstrations themselves were confined to individual students' rooms, the disruption from this type of activity is apparent
 Neither are we moved by AFS's reminder that the dormitories are frequent sites of rowdy student-sponsored gatherings which detract from the study atmosphere of the dormitories. The university has a legitimate interest in minimizing the number of intrusions, and, in addition, may legitimately target only commercial activity for regulation, much like a city may enact a zoning ordinance restricting only commercial activity in certain locations.
 
 
 [31]
 In AFS II, we rejected the students' claim that the regulation violated their "privacy" rights. See supra note 20. Although the students renewed these claims on this appeal, they have raised no argument that explains why these claims are not barred by our decision in AFS II. We therefore reject them
 
 
 [32]
 Judge Sarokin's suggestion that this case could be disposed of simply by holding that AFS's speech is not entitled to first amendment protection because of its unlawful or misleading nature is very attractive. The problem with his approach is that the district court did not make sufficient findings to support it. Neither is our opinion in United States v. American Future Systems, Inc., see note 3, supra, sufficiently particularized or encompassing to conclude the issue
 
 
 [1]
 While I agree that the regulation at issue satisfies the requirements of Central Hudson Gas, I am not certain that these requirements need to be met within the context of this case, given the limited nature of the regulation. As I noted in an earlier opinion in this litigation, in virtually every instance where the Court has struck down regulation of commercial speech, including Central Hudson Gas, the regulation involved flatly prohibited speech about a certain commercial subject. See American Future Systems v. Pennsylvania State University, 688 F.2d 907, 917-19 (3d Cir.) (Adams, J., dissenting from denial of rehearing), cert. dismissed, 459 U.S. 1093, 103 S.Ct. 583, 74 L.Ed.2d 941 (1982). Here, however, the University makes no attempt to suppress all information regarding kitchenware sales, but asks only that such information not be conveyed through group sales in a dormitory room
 
 
 [2]
 Thus, while at first glance it may appear anomalous to label as content-neutral a regulation that differentiates between commercial and non-commercial speech, the distinction is one that is recognized and endorsed by First Amendment doctrine itself. As Justice Stevens has noted, "the measure of constitutional protection to be afforded commercial speech will surely be governed largely by the content of the communication." Young v. American Mini-Theatres, 427 U.S. 50, 69, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976). See also American Future Systems v. Pennsylvania State University, 568 F.Supp. 666, 670 (M.D.Pa.1983)
 To propose that a state cannot impose time, place and manner restrictions on commercial speech unless it also extends these restrictions to non-commercial speech would lead to a truly anomalous result. If such were the rule, commercial speech would receive the same First Amendment protection as non-commercial speech when it is merely limited by prohibition from certain places, but would have a lower level of protection when the state seeks to suppress it altogether. See generally, Shiffrin, The First Amendment and Economic Regulation: Away from a General Theory of the First Amendment, 78 Nw.U.L.Rev. 1212, 1282 (1983); Note, Time, Place, or Manner Restrictions on Commercial Speech, 52 G.W.L.Rev. 127 (1983). The Note characterizes Ohralik v. Ohio State Bar Assn, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444, as implicitly applying a time, place or manner rule to commercial speech. 52 G.W.L.Rev. at 135-37. While the Supreme Court has not yet expressly employed such an approach in the commercial speech context, lower courts have done so. See John Donnelly & Sons v. Campbell, 639 F.2d 6, 9 (1st Cir.1980), aff'd, 453 U.S. 916, 101 S.Ct. 3151, 69 L.Ed.2d 999 (1981); Lovett & Linder, Ltd. v. Carter, 523 F.Supp. 903, 909 (D.R.I.1980).
 
 
 [3]
 The University regulation is analogous to a city zoning ordinance that forbids commercial use of property in a residential area. Such zoning ordinances are commonplace, and would generally withstand constitutional attack as reasonable time, place, and manner restrictions on commercial speech. A plurality of the Supreme Court held in Young v. American Mini-Theatres, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), over a vigorous dissent, that zoning restrictions are legitimate in some cases even for protected non-commercial speech. Justice Powell and Justice Stewart, neither of whom were part of the plurality in American-Mini Theatres, suggested in a more recent concurrence that an ordinance banning all commercial activity in a residential area would be "appropriate and valid." Schad v. Borough of Mount Ephraim, 452 U.S. 61, 79, 101 S.Ct. 2176, 2188, 68 L.Ed.2d 671 (1981) (Stewart and Powell, JJ., concurring). We would, of course, be faced with quite a different question if there were a credible suggestion that the purpose of the restriction here was to inhibit the sales of kitchenware, rather than to preserve the educational and residential character of a dormitory. See Linmark Associates, Inc. v. Willingboro, 431 U.S. 85, 94, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977) (distinguishing between legitimate regulations aimed at "secondary effect" of speech at a particular place and illicit regulations aimed at the "primary effect" of speech, i.e., that listeners will act upon it)
 
 
 [4]
 While I agree with Judge Sarokin that the record indicates that AFS has been less than upright in some of its practices, I am less certain that the "misleading or related to unlawful activity" exception to commercial speech protection may be extended to the facts of this case. The Supreme Court has denied First Amendment protection to "speech proposing an illegal transaction," Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 496, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982) (commercial speech promoting illegal drug use), and to speech which is itself illegal. Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973) (want ads discriminated on basis of sex). In less clearly egregious cases regulations have been upheld, but only after the Court afforded commercial speech some protection and then weighed competing interests. See Ohralik v. Ohio State Bar Assn, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Moreover, the fact that some of AFS' activities have been adjudged illegal does not necessarily render all of its speech unprotected. Since I believe that the regulation is valid even if the speech is assumed to have some commercial speech protection, I am reluctant to extend the contours of the "misleading or related to unlawful activity" exception. My reluctance is heightened by the fact that the district court here did not make sufficient findings with respect to whether AFS's practices were deceptive or illegal to permit an appropriate review of this contention
 
 
 [1]
 The university alleges that the latter practice violates federal and state law, both of which require written notification of the right to cancel within three days. See 16 C.F.R. Sec. 429.1(b); 74 P.S. Sec. 201-7(b). Although the district court originally found otherwise, see AFS, 466 F.Supp. at 39, the contract introduced into evidence here did not contain the required provision. There was, however, oral notification of such right. App. 1136
 
 
 [2]
 Clearly, this picture concerned the university; indeed, once having viewed it, the university was apparently motivated by it to take the actions here at issue. Compare AFS, 553 F.Supp. at 1275 ("The real concern of Defendants has to do with monitoring the 'high pressure salesmanship' of employees of AFS.") with AFS, 464 F.Supp. at 1257 ("In the fall of 1977 Penn State officials did not know of American Future Systems' credit policy or its policy with respect to the 'Florida holiday' drawings ... American Future Systems was prohibited from conducting sales demonstrations at Penn State because of Penn State's policy against such commercial activity occurring within the residence halls rather than because of any view held by Penn State officials as to the propriety or impropriety of American Future Systems' credit plans or its policy with respect to the 'Florida holiday' drawing.")
 
 
 [3]
 Compare, e.g., Friedman v. Rogers, 440 U.S. 1, 13-16, 99 S.Ct. 887, 895-897, 59 L.Ed.2d 100 (1979) (state regulation justified); Ohralik v. Ohio State Bar Association, 436 U.S. 447, 461-62, 98 S.Ct. 1912, 1921-22, 56 L.Ed.2d 444 (1978) (same); United States v. Reader's Digest Association, Inc., 662 F.2d 955, 964-65 (3d Cir.1981), cert. denied, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982) (F.T.C. order designed to prevent false or misleading statement justifies regulation of speech) with Bates v. State Bar of Arizona, 433 U.S. 350, 372-73, 97 S.Ct. 2691, 2703-04, 53 L.Ed.2d 810 (1977) (state regulation not justified on grounds of potential deception of the public)